United States Court of Appeals,

Fifth Circuit.

No. 93-7313.

Joseph WALTON, as next friend of Christopher Walton, a Minor, Plaintiff-Appellee,

v.

Alma ALEXANDER, et al., Defendants,

Alma Alexander, Defendant-Appellant.

Feb. 17, 1995.

Appeal from the United States District Court for the Northern District of Mississippi.

Before POLITZ, Chief Judge, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, GARZA, Emilio M., DeMOSS, BENAVIDES, STEWART, and PARKER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression.'[1]

Christopher Walton was not harmed by the acts of the state or by a state actor; Christopher Walton was harmed by the acts of a private party. He was harmed while attending a state institution, the Mississippi School for the Deaf, as a resident student. He was twice sexually molested by a fellow classmate. He sued the superintendent of the Mississippi School for the Deaf, Alma Alexander, under 42 U.S.C. § 1983. He alleged that the state violated his substantive due process right to bodily integrity under the Fourteenth Amendment because Alexander failed to take appropriate steps to protect him from these sexual assaults by a fellow student. Superintendent Alexander sought dismissal of the suit on summary judgment, asserting qualified immunity on the basis that her

---

[1] *DeShaney v. Winnebago County Dep't. of Social Servs.,* 489 U.S. 189, 198-99, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989).

constitutional duty, if any, to protect students from the acts of fellow students was not clearly established law at the time of the sexual assaults. The district court denied Alexander's claim of qualified immunity. She then filed this interlocutory appeal. We reverse the district court. Although we agree that a very narrow class of persons who stand in a "special relationship" with the state enjoys a clearly established constitutional right to some degree of state protection from known threats of harm by private actors, this "special relationship" only arises when a person is involuntarily confined or otherwise restrained against his will pursuant to a governmental order or by the affirmative exercise of state power. This relationship does not arise solely because the state exercises custodial control over an individual such as is the case when a person voluntarily resides in a state facility. Consequently, we conclude that because no "special relationship" existed between the state and Walton, Superintendent Alexander owed Walton no constitutional duty of protection from harm inflicted upon him at the instance of his classmate. We, therefore, reverse the district court's denial of immunity to Superintendent Alexander and remand for entry of judgment in her favor.

I

During 1987-1988, the Mississippi School for the Deaf (the "School") was one of several state supported institutions available throughout the state to deaf children. Local school districts were obligated to provide deaf educational facilities if more than five deaf students were located within the district. In addition to public facilities, there were private deaf institutions in Mississippi. Deaf children were free to attend either a public or private facility located in Mississippi. Once choosing to attend the Mississippi School for the Deaf, however, those students residing on campus were under the twenty-four hour custody of the School and subjected to strict rules concerning what they were allowed to do and when they could come and go. School employees maintained close supervision over these students and reported any misconduct to the school superintendent.

Christopher Walton was a resident student attending the School during 1987-1988. During the latter part of 1987, a fellow classmate sexually assaulted Walton. This incident was reported to school officials, including defendant Alexander. Alexander filed a report with the Mississippi Department of Public Welfare. Pursuant to the School's policies, both the School and the Mississippi

Department of Public Welfare conducted an investigation of the assault.  After notifying the parents of both children, the School provided counselling for each child and suspended both children for three days.

Upon return from suspension, the two students were placed in separate dormitories. Budgetary constraints, however, forced the school to close one of the two male dormitories in 1988. Consequently, the boys were again housed in the same building.  Walton was assigned a separate unit with a private bathroom, designed to keep him out of the bathrooms with the other male students. Walton, unfortunately, was assaulted a second time by the same classmate.  Alexander was not informed of this second assault.

On November 14, 1991, Walton filed suit in the United States District Court for the Northern District of Mississippi under 42 U.S.C. § 1983 against Alexander.  Walton alleged a violation of his substantive due process right to bodily integrity under the Fourteenth Amendment based on Alexander's failure to protect him from the sexual assaults.  Following the denial of her motion for summary judgment on qualified immunity grounds, Alexander filed this interlocutory appeal pursuant to *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

The panel majority,[2] relying on *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), held that Superintendent Alexander stood in a clearly established "special relationship" to Walton that imposed on her a duty not to be deliberately indifferent to Walton's due process rights.  The panel reasoned that Walton fell within the clearly established "category of persons in custody by means of "similar restraints of personal liberty,' " as those held involuntarily, such as prisoners and involuntarily committed mental patients.  The panel majority, however, reversed the district court's denial of immunity after concluding that Alexander did not act with deliberate indifference to the rights of Walton.

Judge Garwood concurred in the result reached by the panel majority, which reversed the denial of summary judgment.  Judge Garwood, however, argued that the result should have been reached by avoiding the constitutional issues and deciding only that the facts did not support

---

[2]The panel opinion is reported at 20 F.3d 1350 (5th Cir.1994).

deliberate indifference to Walton's alleged rights. With regard to Walton's alleged constitutional rights, Judge Garwood concluded that because Walton attended the School voluntarily, he was not taken in custody and held against his will by the affirmative exercise of state power. Thus, no "special relationship" was created. Finally, Judge Garwood found inconceivable the majority's conclusion that this "special relationship" was clearly established law in 1988. He concluded that no decision of the United States Supreme Court, this court, or any district court in this circuit tended to support this erroneous deduction.

## II

The central issue we address today is whether the state created a "special relationship" with Walton, as a resident student under its custodial care, so that it owed some duty[3]—arising under the Due Process Clause of the Fourteenth Amendment to the United States Constitution—to protect Walton's bodily integrity from third party non-state actors. We conclude that, as a matter of law, it did not.

## III

Because this is a case on appeal from the denial of a motion for summary judgment, we review the record *de novo. Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1412 (5th

---

[3]The duties owed by the state to persons in the state's custody have been articulated differently in different contexts. The state has a duty to provide an involuntarily committed mental patient with certain services and care as are necessary for his "reasonable safety" from himself and others. *Youngberg v. Romeo,* 457 U.S. 307, 315-25, 102 S.Ct. 2452, 2458-63, 73 L.Ed.2d 28 (1982). School officials are required not to be deliberately indifferent to the constitutional rights of school children. *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443 (5th Cir.1994) (en banc) *cert. denied,* --- U.S. ----, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994). The Supreme Court has found that "the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protection available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Our cases have described the duty owed to pretrial detainees somewhat inconsistently. *See Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182, 1187 (5th Cir.1986) (finding prison official obligated not to be deliberately indifferent to due process rights of pretrial detainee). *But see Cupit v. Jones,* 835 F.2d 82, 85 (5th Cir.1987) (holding that pretrial detainees are entitled to reasonable medical care). Under the Eighth Amendment, the duty owed to convicted prisoners is not to be deliberately indifferent to their serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1977). The Seventh Circuit has described still another variation of the duty owed under the Due Process Clause by the state to prisoners to protect them from attacks by other prisoners—not to act with "such callous indifference ... that an official intent to inflict unwarranted harm may be inferred." *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir.1983), *cert. denied,* 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983).

Cir.1993). Under Rule 56(c) of the Federal Rules of Civil Procedure, we examine evidence presented to determine that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Once a properly supported motion for summary judgment is presented, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Brothers v. Klevenhagen,* 28 F.3d 452, 455 (5th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 639, 130 L.Ed.2d 545 (1994). We must review "the facts drawing all inferences most favorable to the party opposing the motion." *Matagorda County v. Russell Law,* 19 F.3d 215, 217 (5th Cir.1994).

## A

Alexander has interlocutorily appealed the denial of qualified immunity. This doctrine insulates her from being forced to litigate the consequences of her official conduct, *Mitchell v. Forsyth,* 472 U.S. 511, 527, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985), unless the plaintiff establishes that she violated a constitutional right that was clearly established at the time of the alleged incident. *Harlow v. Fitzgerald,* 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Spann v. Rainey,* 987 F.2d 1110, 1114 (5th Cir.1993). In analyzing whether Superintendent Alexander is entitled to qualified immunity, we must follow the structural analysis set out by the Supreme Court in *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert,* 500 U.S. at 231, 111 S.Ct. at 1793. We have interpreted *Siegert* to require first an examination of whether the plaintiff has stated a constitutional violation before we reach the issue of qualified immunity. *White v. Taylor,* 959 F.2d 539, 545 (5th Cir.1992); *see Johnston v. City of Houston,* 14 F.3d 1056, 1060 (5th Cir.1994) (finding summary judgment proper on qualified immunity grounds when no constitutional infringement established); *Quives v. Campbell,* 934 F.2d 668, 670 (5th Cir.1991) (affirming grant of summary judgment in favor of defendant for failure to state claim of any constitutional violation).

In this § 1983 suit, we thus proceed to decide whether Walton has asserted a violation of his constitutional rights by Alexander.

B

(1)

In examining Walton's claims, it is important to keep in mind that "section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 450 (5th Cir.1994) (en banc) (quoting *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433, 443 (1979)), *cert. denied,* --- U.S. ----, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994). To state a § 1983 claim for violation of the Due Process Clause, Walton must show that he has asserted a "recognized "liberty or property' interest within the purview of the Fourteenth Amendment, and that [he was] intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Griffith v. Johnston,* 899 F.2d 1427, 1435 (5th Cir.1990) (citations omitted), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. Walton's claim arises under the substantive, rather than the procedural component of the Due Process Clause. This component "protects individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them.' " *Collins v. City of Harker Heights,* 503 U.S. 115, ----, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261, 173 (1992) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 668 (1986)). We have held that "[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process." *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 451 (5th Cir.1994) (en banc) (quoting *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981)). We have not, however, extended this right to encompass harm inflicted on a person by a private actor outside the context of involuntary confinement.

(2)

The Due Process Clause confers protection to the general public against unwarranted governmental interference, but it does not confer an entitlement to *governmental aid* as may be necessary to realize the advantages of liberty guaranteed by the Clause. *DeShaney v. Winnebago County Dep't. of Social Servs.,* 489 U.S. 187, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). In certain limited situations, however, the Supreme Court has recognized that the Constitution may impose on the state a special duty of care owed to certain restricted classes of persons. *See Estelle v. Gamble,* 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976), *cert. denied,* 434 U.S. 974, 98 S.Ct. 530, 54 L.Ed.2d 465 (1977); *Youngberg v. Romeo,* 457 U.S. 307, 315-16, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). This duty generally arises when the state deprives a citizen of his liberty so that he is unable to care for himself. *Id.* In *Estelle,* a state prisoner sued prison officials for failing to provide him with adequate medical care in violation of the Eighth Amendment's prohibition against "cruel and unusual punishment." *Estelle,* 457 U.S. at 101-02, 97 S.Ct. at 290. The Court agreed that the Eighth Amendment, made applicable to the states through the Fourteenth Amendment, imposed upon prison officials a duty to provide prisoners with medical care. *Id.* at 103-04, 97 S.Ct. at 291. The Court held that this duty arose because the prisoners were incarcerated and were deprived of their liberty so that in certain respects they were unable to care for themselves. *Id.* at 103-04, 97 S.Ct. at 291.

In *Youngberg,* the Court similarly found a duty of protection owed under the substantive component of the Due Process Clause of the Fourteenth Amendment. *Youngberg,* 457 U.S. at 315-25, 102 S.Ct. at 2458-63. The Court held that when persons are involuntarily committed to a mental institution and, thus, completely dependent on the state, the state has a duty to provide such patients with certain services and care as are necessary for their "reasonable safety" from themselves and others. *Id.* at 315-25, 102 S.Ct. at 2458-63. The Court reasoned that if the Eighth Amendment prohibited prison officials from holding prisoners in unsafe conditions, then certainly the Fourteenth Amendment prohibited involuntarily committed mental patients from being held in unsafe conditions. *Id.* at 315-16, 102 S.Ct. at 2458.

Thus, with *Estelle* and *Youngberg* as precedential background, the Court approached the

question presented in *DeShaney,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)—whether the substantive component of the due process clause imposes on the state a duty of protection to non-incarcerated and non-institutionalized persons from the harmful acts of non-state actors. In *DeShaney,* young Joshua DeShaney had been placed in state custody because the local Department of Social Services (the "DSS") suspected Joshua's father of child abuse. *DeShaney,* 489 U.S. at 191-92, 109 S.Ct. at 1001. The DSS, however, had returned Joshua to his home after finding insufficient evidence of this abuse to retain the child. *Id.* Once released to his father, however, his father again beat him upon his return home. *Id.* at 193, 109 S.Ct. at 1001. The continued beatings at the hands of his father rendered Joshua comatose and ultimately profoundly retarded. *Id.* Joshua and his mother brought a section 1983 action against the DSS alleging a violation of his substantive due process right under the Fourteenth Amendment to freedom from "unjustified intrusions on personal security," by failing adequately to shield him from his father's violence. *Id.* at 194-95, 109 S.Ct. at 1002. Joshua and his mother contended that the DSS unconstitutionally failed to intervene and protect him against his father when the DSS knew or should have known that he was being abused. *Id.* Because the state has no obligation under the Due Process Clause to protect its citizens from violence at the hands of private actors, the Court held that the state, under these facts, had no constitutional duty to protect Joshua from his father. *DeShaney,* 489 U.S. at 193, 109 S.Ct. at 1002. The Court stated that the purpose of the Due Process Clause was to "protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196, 109 S.Ct. at 1003. Joshua and his mother argued that although it is true that the state had no duty under the Due Process Clause to provide protective services to the general public, the state did have a duty to protect Joshua in particular, because of the "special relationship" the state had created with him as a child under the care of the DSS. *Id.* at 198, 109 S.Ct. at 1004. Referring to *Estelle* and *Youngberg,* the Court acknowledged that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safekeeping and general well-being." *Id.,* 489 U.S. at 199-200, 109 S.Ct. at 1005. The Court further explained that when the state so restrains an individual's liberty that he is unable to act for himself,

and "at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by ... the Due Process Clause." *Id.* at 200, 109 S.Ct. at 1005. This duty to protect, the Court found, arises not because of the state's knowledge of the individual's situation, but from the limitation the state imposed on his freedom to act on his own behalf. *Id.* at 200, 109 S.Ct. at 1005-06. The Court thus reached its holding that the state's affirmative restraint on an individual's liberty, "through incarceration, institutionalization, or other similar restraint of personal liberty," not its failure to act, is the compulsion required to create a "special relationship" and invoke the protection of the Due Process Clause. *DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1006. The Court, thus, found that because Joshua's injuries occurred while in the custody of his father and not while in the custody of the DSS, the state had no constitutional duty to protect him. *Id.* at 210, 109 S.Ct. at 1006. The Court did observe, however, that if the state by its affirmative exercise of power had taken Joshua out of his home and placed him in a foster home operated by state agents, then a relationship might be created sufficiently analogous to institutionalization or incarceration so that a duty to protect would arise. *Id.* at 210 n. 9, 109 S.Ct. at 1006 n. 9.

(3)

Since *DeShaney* was decided by the Supreme Court, we have followed its language strictly and have held consistently that only when the state, by its affirmative exercise of power, has custody over an individual *involuntarily or against his will* does a "special relationship" exist between the individual and the state.[4] *See, e.g., Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521 (5th Cir.1994); *Salas v. Carpenter,* 980 F.2d 299 (5th Cir.1992); *Griffith v. Johnston,* 899 F.2d 1427 (5th Cir.1990); *de Jesus Benavides v. Santos,* 883 F.2d 385 (5th Cir.1989).

---

[4]Prior to *DeShaney,* in *Lopez v. Houston Indep. Sch. Dist.,* 817 F.2d 351 (5th Cir.1987), we found that a school bus driver was entrusted with the care of students attending school under the state's compulsory education statute. *Lopez,* 817 F.2d at 356. We held, consequently, that his failure to protect one such child from injury inflicted by another child supported a section 1983 action "if the jury finds it rose to the level of callous indifference and was a cause of injury." *Id.* Clearly, this is not the type of restraint on personal liberty nor the type of affirmative act by the state intended by *DeShaney.* To the extent the holding in *Lopez* is directly contrary to our holding today, as well as the holding of *DeShaney,* we overrule it.

In *de Jesus Benavides,* prison guards injured by inmates during an escape attempt filed a section 1983 action against the prison officials for failure to protect the guards from this violence. *de Jesus Benavides,* 883 F.2d at 387. We observed that the guards "enlisted, on terms they found satisfactory, and were free to quit whenever they pleased." *Id.* (quoting *Washington v. District of Columbia,* 802 F.2d 1478, 1482 (D.C.Cir.1986)). Consequently, absent the element of involuntariness, their claim was grounded solely in state law and did not establish a constitutional violation. *de Jesus Benavides,* 883 F.2d at 388. Although this holding provides prisoners with greater protection than prison officials, we noted that prisoners were entitled to this duty of protection only because the state restrained their liberty so that they were unable to act for themselves. *Id.* at 388.

In *Griffith,* children who were removed from the parental home, placed under state supervision, and later adopted by a new family filed a section 1983 action against the state claiming that the state deprived them of a liberty interest in the state's post-adoption services that they previously had enjoyed when under state supervision. *Griffith,* 899 F.2d at 1438. The children argued that an ongoing "special relationship" developed between the children and the state from the time the agency removed the children from the natural home imposing on the state a duty to provide them with services after adoption. *Id.* at 1439. We held that the department of human services created a "special relationship" with the children when it removed them from the parental homes and placed them under state supervision. *Id.* at 1439. During this time, the department assumed the responsibility to provide adequate care for the children. *Id.* This duty to provide services terminated, however, once the child was officially adopted by a family. *Id.* at 1439-40.

Most recently, in *Leffall,* the mother of a child killed by random gunfire while voluntarily attending a school-sponsored dance brought a section 1983 action against the school arguing that the school had a duty to protect her son from injury and death from the actions of a private actor. *Leffall,* 28 F.3d at 525. We held that because the student was voluntarily attending the dance and because the dance was held outside required school hours, no "special relationship" existed between the school and the student. *Id.* at 529. The school, therefore, was not under a constitutional duty

to protect the student from injury or death caused by a private actor. *Id.*

Recurring throughout these cases that we have decided since *DeShaney* is the iteration of the principle that if the person claiming the right of state protection is *voluntarily* within the care or custody of a state agency, he has no substantive due process right to the state's protection from harm inflicted by third party non-state actors. We thus conclude that *DeShaney* stands for the proposition that the state creates a "special relationship" with a person only when the person is involuntarily taken into state custody and held against his will through the affirmative power of the state; otherwise, the state has no duty arising under the Constitution to protect its citizens against harm by private actors.

### C

We turn now to consider whether Walton is entitled to claim constitutional protection against the acts of his classmate. Walton argues that a "special relationship" existed between the state and the resident students in Alexander's charge, which imposed upon Alexander a constitutional duty to protect Walton from his fellow classmate's sexual assault. Walton argues that this "special relationship" arose because he lost a substantial measure of his freedom to act because of the significant custodial component present in the regimen of the residential school, which caused him to become dependent on the School for his basic needs. As a resident, Walton slept at the School and took his meals at the School. The School strictly regulated when Walton could come and when he could go. Furthermore, the School severely restricted the conditions under which he could leave the campus. For the most part, the School determined his daily schedule of duties, classes, and activities when he was on campus. Walton alludes to the point that *DeShaney* 's "special relationship" is created by "similar restraint of personal liberty" as that experienced by prisoners and involuntarily committed mental patients, and argues that his residence at the School, placed him under this type of "similar restraint of personal liberty." Thus, he argues that *DeShaney* requires recognition of a "special relationship" between the state and himself.

The record will support the factual contentions asserted by Walton. It is also true, as Walton argues, that *DeShaney* holds that due process is implicated when the state affirmatively restrains a person's liberty "through incarceration, institutionalization, or other similar restraint." *DeShaney,* 489

U.S. at 200, 109 S.Ct. at 1006. Still further, we can agree that Walton forfeited a portion of his autonomy when he became a resident of the School.

But far more important for our purposes today, the record also reflects that Walton attended the school through his own free will (or that of his parents) without any coercion by the state. Although Walton's freedom was curtailed, it was he who voluntarily subjected himself to the rules and supervision of the School officials. Walton's willful relinquishment of a small fraction of liberty simply is not comparable to that measure of almost total deprivation experienced by a prisoner or involuntarily committed mental patient. Nor do the facts establish that the state, through its affirmative acts, held Walton at the School involuntarily and against his will. To the contrary, the record shows that Walton attended this school voluntarily with the option of leaving at will, an option that was never withdrawn. We therefore cannot agree that Walton's status as a resident student places him within the narrow class of persons who are entitled to claim from the state a constitutional duty of protection from harm at the hands of private parties. We think it is important to apply *DeShaney* as it is written. *DeShaney* emphasizes—as we emphasize at the very outset of this opinion—that extending the Due Process Clause to impose on the state the obligation to defend and to pay for the acts of non-state third parties is a burden not supported by the text or history of the Clause, nor by general principles of constitutional jurisprudence. Such an expansion of the state's liability for acts of third parties only can make constitutional sense—that is, holding a government accountable and liable for its official actions—when the state has effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody *and* which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety. It is under such extreme circumstances that the state itself, by its affirmative act and pursuant to its own will, has effectively used its power to force a "special relationship," with respect to which it assumes a certain liability. In short, this "special relationship" does not arise solely because the state exercises custodial control over an individual when a person *voluntarily resides* in a state facility under its custodial rules. Consequently, we hold that no "special relationship" existed between Walton and Alexander. Since Alexander had no constitutional duty to protect Walton against his classmate's

violence, the allegations that she failed to do so simply do not state a violation of the Due Process Clause.[5]

## D

As we have noted, Superintendent Alexander was entitled to qualified immunity from this lawsuit if the constitutional allegations were not clearly established law at the time of the sexual abuse. It follows that since she has no constitutional duty, much less a clearly established duty, she is entitled to immunity.[6] We therefore reverse the district court's denial of Alexander's motion for summary judgment.

## IV

In sum, we hold that a "special relationship" arises between a person and the state only when this person is involuntarily confined against his will through the affirmative exercise of state power. Absent this "special relationship," the state has no duty to protect nor liability from failing to protect a person under the due process clause of the Fourteenth Amendment from violence at the hands of a private actor. Consequently, because Alexander's alleged failure to protect Walton did not violate the Due Process Clause, we hold that she is entitled to qualified immunity from this suit. For the reasons stated above, we REVERSE the district court's order denying qualified immunity to Alexander and REMAND to the district court for entry of judgment dismissing the complaint against Walton.[7]

REVERSED and REMANDED for entry of judgment.

KING, WIENER and BENAVIDES, Circuit Judges, concur in the judgment only.

---

[5]Our opinion should not be construed to diminish Walton's rights under state tort law. *See, e.g., DeShaney,* 489 U.S. at 201-02, 109 S.Ct. at 1006.

[6]"A claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Mitchell,* 472 U.S. at 527-28, 105 S.Ct. at 2816. Although our holding has the same effect as dismissing Walton's claim on the merits, we hold only that the district court erred in failing to grant Alexander summary judgment on qualified immunity.

[7]We find no need to respond to the familiar arguments raised by the special concurrence. As we have made clear in this opinion, state tort laws are available for, and are the appropriate remedy for redress for the sorts of wrong suffered by Walton at the hands of his fellow student, a private actor who was no agent of the state.

ROBERT M. PARKER, Circuit Judge, with whom POLITZ, Chief Judge and STEWART, Circuit Judge, join, concurring specially:

The notion that individuals have a fundamental substantive due process right to bodily integrity is beyond debate. It is also clear that the State[1] owes no general affirmative duty to its citizens to ensure that their rights do not come to harm by other means. What is not so clear is how the Court should resolve the tension often created by the violation of the individual right to bodily integrity by non-state actors under circumstances where the State's role is not strictly a passive one. The constitutional analysis in such circumstances should focus on the role of the State to determine whether a duty exists.

When the role of the State is such that an individual's liberty is limited by state action through incarceration or commitment to a state institution, a corresponding duty is created to assume responsibility for the safety and well-being of the person committed. Christopher Walton, a hearing-impaired minor, was not incarcerated or committed to an institution by the State of Mississippi, but neither was the State a passive player in the facts and circumstances that led to the violation of his bodily integrity. He resided in a state-controlled environment created by the State at the Mississippi School for the Deaf where Ms. Alma Alexander presided as superintendent.

Instead of examining the role of the State in this case, the majority has focused on the role of Christopher Walton's parents in choosing to enroll him in Ms. Alexander's school. Finding their action to be voluntary, the majority announces a bright line rule that represents an extreme constitutional viewpoint. The Court's holding is based on an erroneous reading of the Supreme Court's guidance in *DeShaney,*[2] and draws an arbitrary, illogical, and formalistic line between those persons who are entitled to constitutional protection from the State's deliberate indifference to their safety and those who are not.

I cannot agree with the conclusion that the State had absolutely no duty to residential students

---

[1] The term "State" refers to state and local governmental entities and their agents. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 195 n. 1, 109 S.Ct. 998, 1002 n. 1, 103 L.Ed.2d 249 (1989).

[2] *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

of the Mississippi School for the Deaf to provide at least some level of protection from assault by other students. I would nonetheless reverse the denial of Defendant Alexander's Motion for Summary Judgment because there was no evidence that she was deliberately indifferent to Christopher Walton's safety, and thus there was no showing that the defendant breached the appropriate constitutional standard.

I.

The question presented in this case is whether the State by accepting custody of Walton and exercising extensive control over his day-to-day activities established such a "special relationship" with Walton as to give rise to an affirmative duty to protect him from injury by other students. Walton's assailant was not a state actor; he was another student. However, under the special relationship theory, it is the State's affirmative act of restraining an individual's freedom to act on his own behalf that is the deprivation of liberty triggering the protection of the Due Process Clause. Therefore, what this Court should do is determine whether, under the circumstances, the State sufficiently restrained Walton's personal liberty to trigger the corresponding duty to assume some level of responsibility for his safety and well-being.[3]

The Supreme Court has recognized such a duty in the context of incarceration and involuntary commitment.[4] A duty of protection has also been recognized in cases where a child is involuntarily placed in a foster home.[5] On the other hand, in *DeShaney* the Court found that the county department of social services had no duty to protect a child who was harmed by, and while in the custody of, his natural father.[6]

The plaintiffs in *DeShaney* argued that the rationale of *Estelle* and *Youngberg,* should apply.

---

[3]*DeShaney,* 489 U.S. at 199-202, 109 S.Ct. at 1005-06.

[4]*See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

[5]*See Yvonne L., by and through Lewis v. New Mexico Dept. of Human Services,* 959 F.2d 883 (10th Cir.1992); *Taylor, by and through Walker v. Ledbetter,* 818 F.2d 791 (11th Cir.1987), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989).

[6]*DeShaney,* 489 U.S. at 201-02, 109 S.Ct. at 1006.

In distinguishing these precedents, the Court noted that "[t]aken together [these cases] stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Apparently focusing on this characterization of *Estelle* and *Youngberg,* the majority holds that a special relationship can exist between the State and a person "only when the person is involuntarily taken into state custody and held against his will through the affirmative power of the state[.]"[7]

The majority gives the *DeShaney* holding a broad effect by defining the question presented this way: "whether the substantive component of the due process clause imposes on the state a duty of protection to non-incarcerated and non-institutionalized persons from the harmful acts of non-state actors."[8] However, it is clear that the *DeShaney* court did not foreclose "special relationships" in all cases of non-incarcerated and non-institutionalized persons.

Although *Estelle* and *Youngberg* both involved persons who were taken into custody "involuntarily," the Court explained that the requisite deprivation could occur through "incarceration, institutionalization, *or other similar restraint of personal liberty.*"[9] The precise type of restraint that will create a corresponding affirmative duty was not spelled-out in *DeShaney,* but it seems clear that "similar restraint of personal liberty" means that there may be circumstances other than those in *Estelle* and *Youngberg* that give rise to a constitutional duty to protect.[10]

The majority's holding that custody must be "involuntary" and "against [a person's] will" is so restrictive that it precludes any type of custody short of incarceration or institutionalization giving rise to the duty of protection. In effect, the majority has confined the duty of protection to the circumstances found in *Estelle* and *Youngberg.* Such a narrow application of this duty clearly was

---

[7]Slip Op. at 2298.

[8]Slip Op. at 2296.

[9]*DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1006.

[10]*Graham v. Independent School Dist. No. I-89,* 22 F.3d 991, 994 (10th Cir.1994) ("Nonetheless, *DeShaney* left undefined the precise measure of state restraint that engenders an individuals right to claim a corresponding affirmative duty.").

not contemplated in *DeShaney.*

## II.

The majority attempts to support its position by stating that since *DeShaney,* we "have held consistently that only when the state, by its affirmative exercise of power, has custody over an individual *involuntarily or against his will* does a "special relationship' exist...."[11] However, none of the cases cited by the majority held that a "special relationship" could exist *only* under such circumstances.

This Court's previous opinions have recognized that a special relationship is created when the State "so restrains an individual's liberty that it renders him unable to care for himself."[12] This standard does not limit the affirmative duty of protection to cases where a person is taken into custody "involuntarily," and, instead, is more appropriately read to focus on the conditions of the particular custodial relationship. Indeed, in *Salas v. Carpenter,*[13] this Court held that a "substantive due process right to protective services exists when the state holds persons in *custody* or similarly limits their ability to care for themselves."[14]

In addition, *Leffall v. Dallas Independent School Dist.*[15] provides the majority no support. In *Leffall,* a student was killed by random gunfire in the high school parking lot after a school dance. In holding that the school had no duty to provide for the student's safety, this Court noted that *Leffall* did not involve a school for the disabled or a boarding school with twenty-four hour custody of its students, and therefore did not involve the same level of custodial control found in *Walton.*[16] Thus, our previous decisions do not support the bright-line rule adopted today by the majority. In fact, the

---

[11]Slip Op. at 2297.

[12]*Griffith v. Johnston,* 899 F.2d 1427 (5th Cir.1990) (quoting *DeShaney* ); *de Jesus Benavides v. Santos,* 883 F.2d 385 (5th Cir.1989) (same).

[13]*Salas v. Carpenter,* 980 F.2d 299 (5th Cir.1992).

[14]*Salas,* 980 F.2d at 308 (emphasis added).

[15]*Leffall v. Dallas Independent School Dist.,* 28 F.3d 521 (5th Cir.1994).

[16]*Leffall,* 28 F.3d at 529.

majority's holding requires them to overrule circuit precedent.

In *Lopez v. Houston Independent School Dist.,*[17] a student was beaten unconscious by other students on a public school bus. As the majority acknowledges, we found that the school bus driver had been entrusted with the care of students attending school under the state's compulsory education statute. Indeed, we held that the bus driver's failure to protect one such child from injury inflicted by others would support an action under section 1983. Without elaboration, the majority states that "[c]learly, this is not the type of restraint on personal liberty nor the type of affirmative act by the state intended by *DeShaney.*"[18]

By overruling *Lopez,* the majority clearly indicates that, in their view, compulsory school attendance laws impose no constitutional duty on school officials or employees. Apparently, school attendance by minors is to be considered "voluntary" under the majority's rationale even if mandated by state law. However, the majority fails to explain this patent inconsistency.

Following this decision, parents should be aware when the school bus doors close that if their child is sexually or physically assaulted, the driver of the bus has no constitutional duty to intervene, stop the assault, summon assistance, or attend to any injuries that may have been sustained. Under the majority's reasoning, he may with full knowledge of the assault be totally indifferent to it.

### III.

By requiring that the State take a person into custody involuntarily before gaining a duty to protect that person, the majority has arbitrarily limited due process rights in a way that cannot accurately reflect the nature of the custodial control actually exercised by the State. Rather than simply asking whether a person entered state custody "voluntarily," we should examine the nature of the custodial relationship that existed between the State and the plaintiff.

Under the majority's rule, the State could treat differently a foster child whose parents admit they cannot properly care for the child and willingly turn the child over to foster care from a child who is taken from unwilling parents. The same distinction would exist between voluntarily and

---

[17]*Lopez v. Houston Independent School Dist.,* 817 F.2d 351 (5th Cir.1987).

[18]Slip Op. at 2297 n. 4.

involuntarily committed mental patients, even though their circumstances following commitment would show identical levels of state control, and thus identical restraint of personal liberty. The question is not so much *how* the individual got into state custody, but to what extent the State exercises dominion and control over that individual.

Commentators have been critical of "involuntariness" as a threshold requirement in the context of the custodial control exercised in public schools. For example, Professor Karen Blum has stated that

> [a]ny insistence that a legal compulsion to attend school be present before an affirmative duty to protect is recognized would result in the drawing of irrational and arbitrary classifications defining the circumstances and situations in which students are afforded constitutional protection. The key to the duty owed should be the state's assumption of responsibility for the care and control of students while they are physically present in a state-created and controlled environment.[19]

Even in the context of a regular public school, teachers and school officials exercise extensive control over the activities of the children in their custody, and during the school-day those same officials are in the exclusive position to provide for the protection of those children.[20] As one member of this Court recently observed, "[t]o suggest that parents somehow are in a better position than the schools to protect their children from the ravages of weapons smuggled onto campus during the school day is cruelly irrational. To hope that students who are unarmed can protect themselves from the depredation of armed criminals in their midst is ridiculous."[21]

Instead of asking whether a person was taken into custody involuntarily, we should consider

---

[19]Karen M. Blum, DeShaney: *Custody, Creation of Danger, and Culpability,* 27 LOY.L.A.L.REV. 435, 450 (1994); *see also* Susanna M. Kim, Comment, *Section 1983 Liability in the Public Schools After* DeShaney: *The "Special Relationship" Between School and Student,* 41 U.C.L.A.L.REV. 1101, 1126 (1994); Stephen F. Huefner, Note, *Affirmative Duties in the Public Schools After* DeShaney, 90 COLUM.L.REV. 1940, 1957 (1990).

[20]*See Maldonado v. Josey,* 975 F.2d 727, 735 (10th Cir.1992) (Seymour, J., concurring) ("I cannot fathom who, other than a teacher or other school staff member, is capable of ensuring the "reasonable safety' of school children during the school day and class periods."); *D.R., by L.R. v. Middle Bucks Area Voc. Tech. School,* 972 F.2d 1364, 1380 (3d Cir.1992) (Sloviter, C.J., dissenting) ("During the school day, school officials exercise substantial control over students, either because they are considered to stand *in loco parentis* toward the students, or because proper discipline so requires." (citations omitted)).

[21]*Johnson v. Dallas Independent School Dist.,* 38 F.3d 198, 203 n. 7 (5th Cir.1994).

several factors to determine whether a special relationship exists in a particular case: 1) the authority and discretion state actors have to control the environment and the behavior of the individuals in their custody, 2) the responsibilities assumed by the State, 3) the extent to which an individual in state custody must rely on the State to provide for his or her basic needs, and 4) the degree of control actually exercised by the State in a given situation.

The majority concedes that Walton lived at the School for the Deaf five days a week. In fact, the School controlled when he went to bed and when he awoke, and where he slept in relation to other students. The School controlled when and where he ate his meals and even what he ate. The School decided when he went to class and when he could recreate. The School also strictly regulated when and under what conditions Walton could come and go.

It is certain that Walton depended on school officials to provide for his basic needs while he was in their custody. A child with Walton's handicap would be particularly dependent on the adults with whom he resided. In other words, if the School did not provide for his basic needs while he was in its functional custody, those needs would go unmet.

There can be no doubt that extensive control measures were required in the context of a residential facility for the deaf. Nor can there be any doubt that the School had the authority and discretion to exercise control and restraint over the activities of the students in its custody. By the same token, however, the State necessarily assumed some responsibility for the students' safety and general well-being when it accepted them into its custody and imposed restraints on their ability to act on their own behalf.[22] Under these circumstances, the control exercised by the School and the restraints imposed on Walton's personal liberty were sufficient to meet the *DeShaney* threshold. Yet, because Walton was not seized by the State and forced to attend the residential school against his will, the majority holds that the School had no duty with respect to Walton's safety and well-being.

## IV.

The majority's zeal to ensure that those state actors entrusted with the responsibility to care

---

[22]*K.H., through Murphy v. Morgan,* 914 F.2d 846 (7th Cir.1990) ("Once the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances when he was free.").

for and protect our most vulnerable citizens may do so with constitutional impunity—regardless of their conduct—produces a result that surely must appear absurd to the average citizen. Under the holding of this opinion, law abiding, tax paying citizens who, because they may be simply obeying the compulsory attendance laws or because they have no other economic choice, deliver a child to the care, custody and control of the State, do so at their own risk. At the same time, those who find themselves in the care, custody and control of the State because they are criminals are wrapped in the protective cloak of the constitution.