United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 17, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

)))))))))))))))))))))))))))

No. 05-50653

)))))))))))))))))))))))))))

JANE DOE, Individually and as Next Friend of
SARAH DOE, a minor,

Plaintiff–Appellant,

v.

SAN ANTONIO INDEPENDENT SCHOOL DISTRICT—
BEXAR COUNTY; ET AL,

Defendants

ARTHUR AGUILAR, Individually and as Vice-Principal
of Thomas Edison High School, Division of San Antonio
Independent School District

Defendant–Appellee.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:03-CV-174

---

Before GARZA, PRADO and OWEN, Circuit Judges.

Edward C. Prado, Circuit Judge:[*]

Plaintiffs-Appellants Jane Doe and Sarah Doe (collectively

"Doe") appeal the magistrate judge's grant of summary judgment in

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

-1-

favor of Defendant-Appellee Arthur Aguilar, who it determined was immune from suit.  Doe contends that the magistrate judge erred in dismissing her federal substantive due process claims and state law claims.  For the reasons that follow, we AFFIRM.

## I. Facts

In December 2001, Sarah Doe was a fourteen-year-old special education student[1] at Thomas Edison High School.  Arthur Aguilar was the Assistant Principal of the school.  On Friday, December 7, 2001, a teacher, Ashley Heyen, brought Sarah to Aguilar's office because Sarah had arrived late to class. Aguilar filled out a permission slip for Sarah to return to class at 8:45 a.m. At 9:15 a.m., Heyen again brought Sarah to Aguilar's office. Heyen stated that she found Sarah walking in the hallways.  At this second meeting, Aguilar spoke with Sarah. The parties dispute whether Sarah correctly identified herself to Aguilar. Doe claims Sarah correctly identified herself by name; Aguilar states that she did not.  Both parties agree that Sarah claimed not to know her home address, her student identification number, or her phone number.  Sarah did, however, remember the phone number of a man she told Aguilar was her uncle.  Sarah told Aguilar that her father was always drunk and that her mother was never at home.  At the time, Aguilar thought that Sarah was being

---

[1] The record establishes that Sarah suffers from an emotional disturbance and attention span problems but there is no indication that she is learning disabled.

-2-

"coy."

Aguilar decided to suspend Sarah for truancy and insubordination but was not able to find her in his electronic database of students. So, Aguilar allowed Sarah to call her "uncle" to arrange for him to pick her up from school. Aguilar advised Sarah that he needed to meet with her uncle when he arrived to pick her up. At that time, the school had a non-discretionary release policy that provided that a student may only be released to a parent or legal guardian, a police authority, or a person who a parent had designated by written request.

Aguilar told Sarah to wait in his office until her uncle arrived. At about 9:45 a.m., Aguilar left his office to attend to other duties. He left Sarah alone in the lobby of the main office and did not assign any support personnel to supervise her. Aguilar then forgot about Sarah.

Sarah left school at some later point with her "uncle." At around 5:00 p.m., Sarah's grandmother and guardian contacted the school after Sarah failed to arrive home. Sarah was then discovered by San Antonio police at the home of the man who had picked her up at school. Sarah alleges that he sexually abused her.

## II. Procedural History

Jane Doe, representing her then-minor daughter, Sarah, filed

suit on March 6, 2003 against the San Antonio Independent School District and several of its officials, including Arthur Aguilar. All defendants except for Aguilar were voluntarily dismissed after they filed motions for summary judgment. Doe and Aguilar consented to a trial before a U.S. Magistrate Judge. Aguilar moved for summary judgment on November 12, 2004. The magistrate judge granted Aguilar's motion on April 4, 2005, dismissing Doe's federal and state causes of action in their entirety on the grounds that Aguilar was immune from suit. Plaintiff filed her notice of appeal on May 2, 2005.

## III. Discussion

"We review a grant of summary judgment under the same standard applied by the [magistrate judge]. We examine questions of law *de novo* and construe disputed material facts in favor of the non-movant." *Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 738 (5th Cir. 2005) (internal citation omitted).

A

The first issue is whether Aguilar has qualified immunity from Doe's federal claims. To determine whether qualified immunity applies we use a two-pronged test. *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002)(en banc). First, we ask "whether a constitutional right would have been violated on the facts alleged." *Id.* at 322-23 (quoting *Saucier v. Katz*, 533

U.S. 194, 200 (2001))(internal quotation omitted).  If so, "the next sequential step is to ask whether the right was clearly established.  Ultimately, a state actor is entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions.  *Id.* at 323 (quoting *Saucier*, 533 U.S. at 201)(internal citation and quotation omitted).

Doe alleges a violation of Sarah's right to substantive due process under the Fourteenth Amendment. "To state a § 1983 claim for violation of the Due Process Clause, [Doe] must show that [s]he has asserted a recognized liberty or property interest within the purview of the Fourteenth Amendment, and that [Sarah] was intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Walton v. Alexander*, 44 F.3d 1297, 1301-02 (5th Cir. 1995)(en banc)(internal quotations omitted).  Encompassed in the liberty interest is the right to be free from "unjustified intrusions on personal security." *Ingraham v. Wright*, 430 U.S. 651, 673 (1977).  In general, a state is not liable for private violence.  However, Doe argues that Aguilar had a duty to protect Sarah from third party violence due to a special relationship, and alternatively, that a duty to protect arose under a "state-created danger" theory.

*1. Special Relationship*

"[I]n certain limited circumstances the Constitution imposes

-5-

upon the State affirmative duties of care and protection with respect to particular individuals." *McClendon*, 305 F.3d at 324. The affirmative duty arises when the State imposes limitations on a person's freedom to care for himself, such as when one is incarcerated or institutionalized. *DeShaney*, 489 U.S. at 200. The Supreme Court has stated that, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200. Under this theory, the Court has held that incarcerated prisoners have a right to adequate medical care, that the state must ensure reasonable safety to involuntarily committed mental patients, and that suspects in police custody, who have been injured during their apprehension by the police, have a right to medical care. *See Robinson v. California*, 370 U.S. 660 (1962); *Youngberg v. Romeo*, 457 U.S. 307 (1982); *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239 (1983). In order to state a viable claim under the special relationship theory, "the plaintiff must demonstrate that the state official acted with culpability beyond mere negligence," *McClendon*, 305 F.3d at 325, which the Supreme Court has termed "deliberate indifference." *See, e.g.*, *DeShaney*, 489 U.S. at 198 n.5.

We have already concluded that no special relationship exists between a student at a state residential school for the

deaf and school officials at that school, despite the "custodial component present in the regimen of a residential school." *Walton*, 44 F.3d at 1304-06. Doe argues, however, that the State was under a duty to protect Sarah because she was subjected to heightened supervisory authority when Aguilar took her into his "custody" to suspend her and was held against her will. We disagree.

Sarah Doe's liberty was not restrained in a manner that would give rise to a constitutional obligation to protect. A "'special relationship' only arises when a person is involuntarily confined or otherwise restrained against his will pursuant to a governmental order or by the affirmative exercise of state power. This relationship does not arise solely because the state exercises custodial control over an individual." *Id.* at 1299. As we stated in *Doe v. Hillsboro Independent School District*, 113 F.3d 1412 (5th Cir. 1997)(en banc):

> The restrictions imposed by attendance laws upon students and their parents are not analogous to the restraints of prisons and mental institutions. . . . "Though attendance may not always be voluntary, the public school remains an open institution. Except perhaps when very young, the child is not physically restrained from leaving school during school hours . . . ."

*Id.* at 1415 (quoting *Ingraham*, 430 U.S. at 670). Aguilar's instructions to Sarah to wait outside the assistant principal's office until a parent or guardian arrived to pick her up did not rise to the level of incarceration, institutionalization, or

police custody.  Unlike a prisoner, criminal suspect, or person in a mental institution, Sarah was able to leave the school premises with relative ease.  *See id.* (pointing out that a student's attendance at school is intermittent, the student returns home each day, and that parents are the primary care giver to a student who attends public school).  Indeed, Sarah left.

Furthermore, Aguilar's behavior did not rise to the level of deliberate indifference.  The parties state that Aguilar forgot about Sarah, not that he disregarded a known danger.  *See e.g.*, *DeShaney*, 489 U.S. at 198 n.5 ("[A] prisoner must show that the state defendants exhibited 'deliberate indifference' to his 'serious' medical needs; the mere negligent or inadvertent failure to provide adequate care is not enough.").

The State was not under a duty to protect Sarah due to a special relationship.

*2. State-Created Danger*

Many circuits have held that "state officials can have a duty to protect an individual from injuries inflicted by a third party if the state actor played an affirmative role in creating or exacerbating a dangerous situation that led to the individual's injury."  *McClendon*, 305 F.3d at 324.  "We have never recognized state-created danger as a trigger of state affirmative duties under the Due Process Clause."  *Rivera v.*

*Houston Indep. Sch. Dist.*, 349 F.3d 244, 249 (5th Cir. 2003). Even if we were to consider Doe's claims under the state-created danger theory, Doe would need to show that Aguilar acted with deliberate indifference towards Sarah. *Id.* Deliberate indifference is a stringent standard of fault, beyond mere negligence and usually requires proof that a state actor disregarded a known or obvious consequence of his actions. *See, e.g.*, *Marasco*, 318 F.3d at 509. Aguilar's actions do not reach the level of deliberate indifference. While Aguilar knew that Sarah had been wandering the halls earlier that day and still left her unattended, the danger that Sarah might be raped by her "uncle" was not a known or obvious danger to Aguilar.

Doe has not alleged a violation of substantive due process, and we need not address whether Aguilar's conduct was objectively reasonable in light of the clearly established legal rules at the time of the alleged violation. Aguilar is entitled to qualified immunity from Doe's federal claims.

B

The next issue is whether Aguilar is immune from Doe's state law negligence claims. The Texas legislature has recognized a public school principal's immunity from suit. *Johnson v. Calhoun County Indep. Sch. Dist.*, 943 S.W.2d 496, 498 (Tex. App. 1997). According to the Texas Education Code:

A professional employee of a school district is not

-9-

personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

TEX. EDUC. CODE ANN. § 22.051(a)(Vernon 1996)(amended 2003).[2]

The issue is whether Aguilar is not immune because he falls within the exception that may be applied when a principal's negligence results in bodily injury to a student. The Texas Supreme Court has limited section 22.051's negligence exception to immunity to situations involving "negligent discipline." *Hopkins v. Spring Indep. Sch. Dist.*, 736 S.W.2d 617, 619 (Tex. 1987). Negligent discipline is "punishment which involves no force, but rather requires some action on the part of the student *as a result of which* the student suffers bodily injury." *Id.* *(*emphasis added). A typical example of "negligent discipline" is when a teacher forces a student to run laps around an athletic field, and the student suffers physical injury from running the laps. *See Diggs v. Bales*, 667 S.W.2d 916, 918 (Tex. App. 1984).

Texas case law imposes four requirements for conduct to constitute negligent discipline: (1) the school district employee must be negligent; (2) the circumstances must involve student punishment, (3) the punishment must require some action on the

_____

[2] This version of the statute was effective until August 31, 2003.

-10-

part of the student, and (4) the student must suffer bodily injury as a result of the punishment. *See Hopkins*, 736, S.W.2d at 619 ("'Discipline' in the school context ordinarily describes some form of punishment. The opinion in *Diggs v. Bales* describes 'negligent discipline' as 'punishment [which] involves no force, but rather requires some action on the part of the student as a result of which the student suffers bodily injury,' as in ordering a student to run laps."). Here, we cannot say that Sarah suffered bodily injury as a result of her punishment.

Aguilar's disciplinary actions did not result in Sarah's injury. There must be a nexus between a state actor's negligent conduct, the punishment, and the student's ultimate injury. *See Diggs*, 667 S.W.2d at 918 (limiting the liability of professional school employees to acts incident to the disciplining of students); *see generally*, *Estate of Garza v. McAllen Indep. Sch. Dist.*, 613 S.W.2d 526 (Tex. App. 1981). Aguilar disciplined Sarah by ordering her to stay in the office until he could meet the person she identified as her uncle. One could argue that leaving Sarah unattended when she had a history of "wandering" constituted negligence on Aguilar's part. However, Aguilar never released Sarah to her "uncle." Instead, Sarah left the school premises against Aguilar's instructions. Sarah's departure with her "uncle" was not part of her punishment. Her subsequent injury was inflicted by a third-party private actor, off of the

-11-

school premises.  Sarah's injury was not a foreseeable result of Aguilar's actions, and her injury did not result from Aguilar's disciplinary actions.

Aguilar enjoys professional immunity from Doe's state law claims.

AFFIRMED.