**Blanche RANDOLPH, as Conservator of Deborah Randolph, Plaintiff.**

v.

**Al CERVANTES, Pine Belt Mental Health Center, et al., Defendants.**

Civil Action No. 2:95–CV–259PG.

United States District Court, S.D. Mississippi, Hattiesburg Division.

Dec. 30, 1996.

Kenneth R. Watkins, Kenneth R. Watkins, Attorney, Gulfport, MS, for plaintiff.

Vicki R. Leggett, Patrick H. Zachary, Zachary & Leggett, Hattiesburg, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

This cause is before the Court on Cross Motions for Summary Judgment. The Court, having reviewed the motions, the briefs of the parties, the authorities cited and being otherwise fully advised in the premises, finds as follows to-wit:

## FACTUAL BACKGROUND

Deborah Randolph was diagnosed as a paranoid schizophrenic in 1978 at the age of 17 years. Prior to the incident which gave rise to the instant litigation, Randolph was involuntarily committed to state mental hospitals on no less than nine occasions and she had a known history of violent and self-destructive behavior. In December 1991 Deborah's mother, Blanche Randolph, again initiated involuntary commitment proceedings after Deborah allegedly set fire to her mother's mobile home, causing significant damage. Deborah's mother would not allow Deborah to reside with her after the incident of the fire. On December 11, 1991, the sani-ty hearing, initiated by Deborah's mother, was conducted in Forrest County Chancery Court. After considering all the testimony, including that of Pine Belt Mental Health Center caseworker Al Cervantes, the chancellor ordered Deborah to submit to outpatient treatment at Pine Belt Mental Health Center; said treatment was to be supervised by the above-mentioned Cervantes.

Deborah Randolph was released on her own recognizance and took up residence at a Section 8 apartment on Florence Street. Deborah remained at that address until June 1992 when she was evicted for failing to comply with her rent agreement. Mr. Cervantes assisted Deborah in applying for residence at Pine Hill Apartments, a complex owned and operated by Pine Belt Mental Healthcare. Deborah's application was approved and she took up residence at Pine Hill in late June 1992. As a condition to approval of lease applications, all prospective Pine Hill residents must agree to abide by Pine Hill Apartments' rules and to participate in various programs sponsored by Pine Belt Mental Healthcare. Residence at Pine Hill is otherwise voluntary and either party to the lease agreement may terminate the lease by giving 30 days notice. Pine Belt Mental Healthcare provided counseling to Plaintiff, helped with her financial planning, helped her take her medication, provided transportation and other like assistance. Deborah also received social security disability benefits and SSI benefits. Since Deborah's mother felt she could not take care of her after the fire incident, Deborah was taken care of by various governmental or quasi-governmental programs.

On August 18, 1992 Deborah Randolph found a used syringe in a garbage receptacle utilized by a neighboring resident who was likewise being assisted by Pine Belt Mental Healthcare and who happened to be an insulin dependent diabetic. She took some of that neighbor's insulin and injected it into each of her eyes. Shortly thereafter, Deborah contacted Mr. Cervantes and complained of discomfort with her eyes. Mr. Cervantes responded to Deborah's complaint and visited her at the apartment complex. He noted that Deborah's eyes indeed appeared irritat-

ed, but Deborah responded negatively when questioned about whether she had done anything to her eyes. Cervantes assisted Ms. Randolph in washing out her eyes and left. He returned to check on Deborah later that day and again assisted her in bathing her eyes; he further decided that in the event the condition was no better by morning, then he would escort her to a doctor. On the morning of August 19, 1992, Cervantes again visited Ms. Randolph and noted that her eye condition appeared to have worsened—Cervantes then drove Deborah to the emergency room. When questioned by the emergency room physician, Deborah confessed to having injected her eyes with insulin. Despite emergency surgery, Deborah lost one eye entirely and has only limited light perception in the second eye.

Deborah's mother, acting as conservator, filed the instant lawsuit in August 1995, alleging a violation of Deborah's right to substantive due process in violation of 42 U.S.C. § 1983 and seeking recovery of actual, compensatory, hedonic, punitive and exemplary damages. No conservator had ever been appointed for Deborah Randolph until her mother was appointed for the purpose of filing this lawsuit. This cause is now before the Court on each party's Motion for Summary Judgment on the issue of liability.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The existence of a material question of fact is a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. Of T. For State C. & U.)*, 757 F.2d 698, 712 (5th Cir.1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir.1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir.1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, ... all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir.1992).

In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in the light most favorable to the nonmoving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir.1984). The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on its motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir.1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] ini-

tial burden of demonstrating [entitlement to summary judgment.]" *John,* 757 F.2d at 708. "Summary judgment" cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment, "even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion." *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.,* 584 F.2d 111, 114 (5th Cir.1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In re Municipal Bond Reporting Antitrust Lit.,* 672 F.2d 436, 440 (5th Cir.1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed. R.Civ.P. *See also, Union Planters Nat. Leasing v. Woods,* 687 F.2d at 119.

While generally "[t]he burden to discover a genuine issue of fact is not on [the] court," (*Topalian,* 954 F.2d at 1137), "Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention—the court must consider both before granting a summary judgment." *John,* 757 F.2d at 712, *quoting Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410 (5th Cir.1980).

## LEGAL ARGUMENTS

Plaintiff seeks recovery for an alleged constitutional violation pursuant to 42 U.S.C. § 1983 which provides:

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.*

In order to recover, Ms. Randolph must prove deprivation of a right secured by the Constitution or laws of the United States and that the deprivation was a result of state action—i.e., conduct fairly attributable to the State. Plaintiff maintains that the record establishes all of these elements and thus seeks this Court's ruling in her favor on the issue of liability. Defendants, by contrast, contest all elements of the § 1983 action and would have this Court sustain their cross motion for summary judgment.

Based on the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services* and the Fifth Circuit's subsequent *en banc* opinion in *Walton v. Alexander,* it is the conclusion of this Court that Ms. Randolph's allegations do not come close to demonstrating a constitutional violation. 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); 44 F.3d 1297 (5th Cir. 1995). The state involvement in *DeShaney* was about the same as in this case. State involvement in the *Walton* case in the opinion of this Court was considerably greater than the state involvement in the case at bar. The conduct in both of those cases was far more egregious than the conduct herein and in both of those instances, the Supreme Court and the Fifth Circuit respectively concluded that no cause of action was stated.

The *DeShaney* Court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. at 197, 109 S.Ct. at 1004, 103 L.Ed.2d at 259. The Court, after reciting the wording of the Due Process Clause which provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law," [1] went on to note that

... nothing in the language of the Due Process Clause itself requires the State to

---

**1.** *Id.* at 194, 109 S.Ct. at 1002, 103 L.Ed.2d at 258.

protect the life, liberty, and property of its citizens against invasion by private actors. *The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.* It forbids the State itself to deprive individuals of life, liberty, or property, without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to insure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text.

*Id.* at 195, 109 S.Ct. at 1003, 103 L.Ed.2d at 258–59. (emphasis added). The *DeShaney* Court did recognize that in at least two types of situations the existence of a "special relationship" would impose affirmative duties on a state under the Due Process Clause to provide for the reasonable safety and well-being of certain individuals. Plaintiff relies on the existence of a "special relationship" as described in *DeShaney* to establish a duty on the part of the State of Mississippi to provide for her reasonable safety and well-being. Plaintiff argues that the State owed Deborah Randolph a duty to protect her from herself.

The Court in *DeShaney* found that "[i]n the substantive due process analysis, *it is the State's affirmative act of restraining the individual's freedom to act* on his own behalf—*through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protection of the Due Process Clause,* not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* at 200, 109 S.Ct. at 1006, 103 L.Ed.2d at 262 (footnote omitted) (emphasis added). Plaintiff argues that the circumstances in which she found herself at the time of her injury constituted a "similar restraint of personal liberty," thus making her the beneficiary of an affirmative duty of protection by the State of Mississippi under the Due Process Clause.

■ However, the Fifth Circuit's interpretation and application of *DeShaney* limit the aegis of a "special relationship" to instances "only when the state, by its affirmative exercise of power, has custody over an individual

*involuntarily or against his* will. . . ." *Walton,* 44 F.3d at 1303 (emphasis in original). Notwithstanding Plaintiff's arguments to the contrary, this Court finds, as a matter of law, that the action of Pine Belt Mental Healthcare in attempting to assist Plaintiff so that she could live in the least restrictive environment possible without being institutionalized and the action of the Forrest County Chancery Court in ordering Ms. Randolph to undergo outpatient treatment at Pine Belt Mental Health Center is insufficient to give rise to a special relationship as defined in *DeShaney* which would have imposed an affirmative duty on the part of the State to provide for her safety.

While the chancery court's order operated to restrain Plaintiff's liberty to a certain extent, the limitation on her liberty was not so extensive as to render her unable to care for herself. Indeed, Plaintiff was released on her own recognizance following the sanity hearing on December 11, 1991. She lived on her own in the months after the chancellor's order. Her execution of an application for residence at Pine Hill Apartments was not involuntary in the sense that the State exercised force. Plaintiff avers only that "she had no other choice." With all deference, Plaintiff's lack of choice was a result of forces not related to the State; rather, her lack of alternatives resulted from her illness and the effects thereof—not the affirmative exercise of the State's power. The acts of those associated with Pine Belt Mental Healthcare, if indeed said acts are fairly attributable to the state, fall into the category of beneficent acts on Plaintiff's behalf and are not of the character necessary to support Plaintiff's claim of a "special relationship" pursuant to *DeShaney.* Further, the Chancery Court's order only required Plaintiff to submit to outpatient treatment. The court order did not require Plaintiff to live at any particular place or to submit to any particular regimen.

■ While Plaintiff never directly addresses the issue, it seems that she may also be attempting to assert an additional argument under the "state created danger" theory. Plaintiff asserts at several points in her brief that the State's disregard for Ms. Randolph's safety was most obvious in its deci-

sion to place her with a roommate/neighbor who was an insulin dependent diabetic, thereby permitting Plaintiff access to the instrumentalities used to inflict her injuries. Although the Fifth Circuit has yet to recognize the state created danger doctrine, the facts of this case are insufficient to support recovery under that theory. In order to recover on the basis of a "state created danger," a plaintiff must demonstrate not only that "the state increased the danger of harm from third persons; the § 1983 plaintiff must also show that the state acted with the requisite culpability in failing to protect the plaintiff from that danger to make out a constitutional violation." *Leffall v. Dallas Independent School Dist.*, 28 F.3d 521, 531 (5th Cir.1994). The standard for liability under the "state created danger" theory is that of "deliberate indifference." Assuming that the actions of those associated with Pine Belt Health Care and Pine Hills Apartments are sufficient to show state action, this Court is unconvinced that the acts or omissions which resulted in Deborah's having access to the instrumentalities she ultimately used to inflict harm upon herself amount to anything more than negligence, if that. This Court is certainly not suggesting in any manner that Defendant was negligent under the facts of this case. What the Court is noting is that Plaintiff's allegations at most allege only negligence, not a constitutional deprivation.[2] Negligence, even gross negligence, is insufficient to support a § 1983 claim predicated on the state created danger theory.[3] *Id.*

In *Walton* the Court noted that " 'Section 1983 imposes liability for violation of rights protected by the constitution, not for violations of duties of care arising out of tort law.' " 44 F.3d at 1301 (citations omitted). The *Walton* Court went on to hold "the due process clause confers protection to the general public against unwarranted government interference, but it does not confer an entitlement to governmental aid ..." *Id.* at 1302.

As indicated, Plaintiff's claim in essence is that under a substantive due process theory, irrespective of state tort law, the Defendants should have protected Plaintiff from her own actions. Plaintiff argues for an extension of constitutional law to impose a duty under the due process clause on those who operate governmental programs, or quasi governmental programs, to assist persons with mental illnesses that would require such persons to affirmatively protect such mentally ill persons from harm inflicted by others or harm which such a person might inflict upon themselves.

Section 1983 imposes liability only if three things are proven: (1) that there is state action and that (2) such state action causes (3) deprivation of a constitutional right. Assuming, but not deciding that state action is implicated in this case, this Court concludes that Plaintiff has not demonstrated that there is a genuine issue of material fact either as to causation or the deprivation of a constitutional right. Plaintiff caused her own injury. That of which she complains does not implicate a deprivation of a constitutional right and even if it did Plaintiff certainly has not demonstrated any "wilful indifference" to her situation. Defendant was very attentive to Plaintiff especially after she inflicted harm on herself. While a negligent failure to assist such persons might form the basis for liability under a state law tort claim, there is no justification to further extend the Constitution in this area. The plain language of the Due Process Clause does not mandate such an extension and state tort laws do not leave such a gaping hole in tort law as to justify any such extension as a matter of substantive due process.

---

2. No issue of state tort law is before this Court.

3. In *Walton,* a panel of the Fifth Circuit concluded that under the *DeShaney* holding which mentioned "other similar restraint of personal liberty" that a "special relationship" under the particular facts of that case did exist, but went on to hold that the standard of liability by which the conduct of the official involved should be judged was that of "deliberate indifference" and that the record did not reflect a genuine issue of

material fact as to "deliberate indifference." Hence, the panel concluded that summary judgment was appropriate. The Fifth Circuit *en banc* concluded that the panel was in error in holding that there was a "special relationship" which imposed any affirmative duty on the state. The *en banc* decision never reached the question of whether or not the conduct of the official was "deliberately indifferent."

The judiciary from time to time has a tendency to apply legal principles as if they are mathematical formulas. One legal principle is established relating to a given constitutional provision and then a second legal precedent is grafted off the first legal principle; then another legal principle is added to the mix. Further, if all three are assumed to be controlling as to a given case, a fourth or fifth is developed and they are all combined in accordance with perfect logic. The problem is that by establishing one precept and stacking another on top ad infinitum you ultimately reach a conclusion that is ludicrous. Such judicial pyramiding is one of the things that has caused some to question whether the law in many instances has lost touch with reality, reason and common sense.[4] The law is not a science.

While judicial interpretations should always begin, and in the opinion of this Court should usually end, after determining the literal meaning of a constitutional provision or statute, nevertheless, when judicial precedents have gone beyond literal meaning, the past legislative as well as judicial history should be considered as well as the potential consequences and effect of what another judicial extension would entail. The Fourteenth Amendment was one of a triad of constitutional amendments adopted shortly after the Civil War which were aimed at guaranteeing the liberty and civil rights of recently freed slaves. Section 1983 was intended as a mechanism for enforcing the Fourteenth Amendment. For almost 100 years the Fourteenth Amendment as well as § 1983 were narrowly construed, if construed at all.

As the cases already cited indicate, state governments for many years assumed little responsibility for the mentally ill. When states finally did assume more responsibility for the mentally ill, they did so by constructing mental hospitals and most often simply locking the mentally ill up for life. Prior to the 1970s the family of a person who suffered mental illness had basically two choices, (1) they could care for a loved one at home, if they could and if they had the inclination, or (2) they could have the loved one committed to a mental institution.

In the 1970s as courts expanded the scope of the Fourteenth Amendment, it was determined that as a general proposition, persons who suffered from mental illness could not be confined except for treatment, unless such persons were a danger to themselves or to others. *See O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). It became accepted as a constitutional principle that the mentally ill, if they were to be treated at all by the states, had to be treated in the least restrictive environment possible. Consequently, states tried to comply with this judicial interpretation of the Fourteenth Amendment by passing statutes such as Miss.Code Ann. § 41–21–73(4) (1972), which provides:

> If the court finds by clear and convincing evidence that the proposed patient is a mentally ill or mentally retarded person and, if after careful consideration of reasonable alternative dispositions, including, but not limited to, dismissal of the proceedings, the Court finds that there is no suitable alternative to judicial commitment, the court shall commit the patient for treatment in the least restrictive treatment facility which can meet the patient's treatment needs.
>
> Alternatives to commitment to inpatient care may include, but shall not be limited to: voluntary or court-ordered outpatient commitment for treatment with specific reference to a treatment regimen, day treatment in a hospital, night treatment in a hospital, placement in the custody of a friend of relative or the provision of home health services.

*Id.*

▇ As the Court in *DeShaney* explicitly pointed out, the literal language of the Fourteenth Amendment prohibits a state from affirmatively bringing about or causing a constitutional deprivation, but it does not require a state to affirmatively take action to protect its citizens. Despite the recognition

**4.** See Philip K. Howard, *The Death of Common* *Sense: How Law is Suffocating America,* (1994).

by the *DeShaney* Court that the literal language of the Fourteenth Amendment only prohibited states from taking certain action and that the Amendment did not mandate any action, the Court did review prior judicial precedent in at least two types of cases which did require states to affirmatively provide certain care. These two types of cases are implicated when a state (1) locks an inmate up in prison or when a state (2) commits a mentally ill person to a mental institution. This case does not present the type of restraint which the Supreme Court and/or the Fifth Circuit concluded imposed a duty on the state to take affirmative action to protect citizens. If, as the *DeShaney* Court concluded, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," 489 U.S. at 197, 109 S.Ct. at 1004, 103 L.Ed.2d at 259, then the Due Process Clause likewise does not mandate an affirmative duty on the part of the states to protect a citizen from herself or himself. Certainly a State has no duty under the Due Process Clause to protect a person from himself or herself when the state has exercised no more restraint over an individual than occurred in this case.

This Court has already indicated the options Deborah Randolph's family would have faced thirty or forty years ago: to either care for her themselves, or to have her locked up in an institution. In this instance, the federal government, together with the State of Mississippi—through its statutes and somewhat indirectly through the Defendant Pine Belt Mental Health, provide Plaintiff with the following: social security benefits, SSI benefits, Section 8 housing, supervision, counseling, transportation, assistance with medication and help in general so that she can live as independently as possible and not be a burden to her family. While it is true that by the loss of her sight, Plaintiff experienced great loss and injury, the care of Plaintiff and the expenses related to her care will still be borne by the same entities that were bearing the expense and responsibility before her injury. The damage to these entities, in that Plaintiff will now require greater care and more medical attention, is not insignificant in the least.

If judicial precedents under the Fourteenth Amendment were to be extended to include this fact situation, the federal judiciary would indeed have dealt successive hammer blows to state governments under the Due Process Clause: First, the federal judiciary has already determined that states cannot institutionalize people afflicted with mental illness unless they are dangerous and unless the state affords treatment for such mentally ill in the least restrictive environment possible. Second, the judiciary, if Plaintiff's arguments were to be accepted, would in effect say to the states: "If you try to tailor a program according to the constitutional mandates we have established and care for your mentally ill in the least restrictive environment, then we will second guess you if the program we in effect have mandated has bad results. In such a situation we will further subject you to liability for damages, actual and punitive, through civil actions."

Human beings are not now and never will be perfect. Because of this, mistakes will be made. Tragic events such as that which occurred here will occur. Hindsight will always be better than foresight. What happened to Plaintiff is indeed tragic and this Court has no doubt that all involved wish it had never occurred, but that does not provide cause for the federal judiciary to expand the Fourteenth Amendment and provide civil liability in a case such as this. The literal language of the Due Process Clause mandates no such extension, and this Court finds no other justification for such an extension.

It is worth noting that what little restraint was placed on Plaintiff in this case was by virtue of a Court order requiring her to submit to outpatient treatment to be rendered by Defendants. It is textbook law that judicial decision making is protected by absolute immunity. We have not been quite so careful in providing immunity for the actions of those outside the judiciary; and quite frequently the federal judiciary has been willing to second guess what other officials have done. But certainly the facts in this case do not demand an extension of the Fourteenth Amendment. Some might forcibly argue that persons injured under the

facts of this case, or in similar situations, should have a cause of action; but if so, it should be by legislation and not by judicial expansion of the Fourteenth Amendment.

As the Court noted in *DeShaney* "... the Due Process Clause of the Fourteenth Amendment ... does not transform every tort committed by a state actor into a constitutional violation." 489 U.S. at 202, 109 S.Ct. at 1006, 103 L.Ed.2d at 263. The Court pointed out that "it is well to remember once again that the harm was inflicted not by the State of Wisconsin, but by Joshua's father. The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Id.*

The *DeShaney* Court noted that it was Joshua's father who inflicted the injury. In this case it was Plaintiff herself who inflicted the injury. This Court is of the opinion that in this case it cannot even be said that Defendants stood by and did nothing. The record indicates that they took a number of actions to try to help Plaintiff; certainly once Plaintiff injured herself, Defendants were responsive to Plaintiff.

If Courts create § 1983 liability under facts such as this, it could discourage governments from providing services such as those afforded Plaintiff. Plaintiff and others similarly situated would suffer from the absence of such programs. What happened to Plaintiff is unfortunate and this Court is sympathetic with Plaintiff's problem; but this case is a prime example of why the bench and bar are criticized for creating a society that has become overly litigious. Not every unfortunate happening in life gives rise to a lawsuit.

This Court therefore finds that Defendant's Motion for Summary Judgment is well-taken and should be granted. Plaintiff's Cross–Motion is not well-taken and should be denied. Plaintiff's Motion to Amend is moot and should be dismissed. However, even if Plaintiff's Motion to Amend had been granted, it would not have affected the Court's decision as to summary judgment.

IT IS, THEREFORE, ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment is well-taken and should be, and hereby is, GRANTED. Plaintiff's Cross Motion for Summary Judgment is not well-taken and should be, and hereby is DENIED. A separate judgment will be entered in accordance with the requirement of Rule 58 of the Federal Rules of Civil Procedure.