**James Christian KINZIE, Plaintiff,**

v.

**DALLAS COUNTY HOSPITAL DISTRICT d/b/a Parkland Memorial Hospital, Defendant.**

**No. CIV.A.3:99–CV–2825–L.**

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 3, 2003.

---

Michael W. Shore, Joel M. Fineberg, Law Office of Joel M. Fineberg, Dallas, TX, for Plaintiff.

Winston L. Borum, Borum & Hancock, Fort Worth, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Before the court are the following:

1. Defendant's Second Motion to Dismiss, filed April 14, 2000;

2. Plaintiff's Response to Defendants' Second Motion to Dismiss, filed April 25, 2000;

3. Defendants' Reply to Plaintiff's Response to Defendants Second Motion to Dismiss, filed May 5, 2000;

4. Defendants' Supplemental Brief in Support of its Second Motion to Dismiss, filed November 6, 2000;

5. Plaintiff's Surreply to Defendants' Reply to Plaintiff's Response to Defendants' Second Motion to Dismiss, filed March 30, 2001;

6. Defendants' Second Supplemental Brief in Support of its Second Motion to Dismiss, filed October 21, 2002;

7. Plaintiff's Supplemental Response to Defendants' Motion to Dismiss, filed October 21, 2002; and

8. Appendix to Plaintiff's Supplemental Response to Defendants' Motion to Dismiss, filed October 21, 2002.

After careful consideration of Plaintiff's Third Amended Complaint ("Complaint"), the motion, response, reply, surreply, briefs, supplemental briefs, appendices submitted by the parties, and applicable law, the court grants Defendant's Second Motion to Dismiss.

## I. Facts and Procedural Background

In March 1985, Plaintiff James Christian Kinzie ("Plaintiff" or "Kinzie") underwent heart surgery at Children's Medical Center in Dallas, Texas. He was four years old. During the surgery and recovery, he received several units of blood through blood transfusion. The blood transfused to Kinzie was provided by a blood bank operated by Defendant Dallas County Hospital District d/b/a Parkland Memorial Hospital ("Parkland" or "Defendant"). Parkland is a governmental entity.

The blood transfused to Kinzie was infected with the human immune deficiency virus ("HIV"), which is the virus that causes acquired immune deficiency syndrome ("AIDS"). AIDS is a severe immunological disorder transmitted primarily through venereal routes, or by exposure to contaminated blood or blood products, resulting in a defect in the cell-mediated immune response manifested by increased susceptibility to life threatening infections and conditions. *See* The American Heritage Steadman's Medical Dictionary 25 (1995); and Merriam Webster's Collegiate Dictionary 24 (10th ed.1999). There is no known cure for AIDS, and it is a deadly disease.[1] Simply stated, when a person has AIDS, his or her immune system breaks down and the person becomes highly susceptible to rare illnesses that would not normally occur in a individual whose immune system was not infected with HIV.

Parkland obtained the HIV infected blood from a homosexual male donor at one of its mobile collection stations. The blood technician who drew the blood did so without completing documentation to verify that she: 1) gave the donor information about the transmission of HIV through blood transfusions; 2) asked the donor appropriate HIV-screening questions;[2] and 3) ensured that the donor read and understood the provided literature that addressed HIV-related issues. That documentation was instead forged on the technician's behalf, and the individual responsible for the forgery was not identified by the parties. The technician's conduct allegedly was indicative of widespread training practices promoted and implemented by Parkland. Parkland also allegedly had an established "don't ask, don't tell" policy with regard to the sexual history of blood donors, although it was aware that homosexual males were at high risk for HIV infection.

Parkland accepted the infected blood in question from the donor, made it available to Kinzie at Children's Medical Center before it was tested for HIV, and waited two months after he (Kinzie) had received the blood before testing it. In September 1985, Parkland was informed that the blood had tested positive for HIV, but did not notify Kinzie. This allegedly was done pursuant to an established policy of not notifying former blood recipients that they had received HIV-positive blood. Accordingly, Kinzie was not aware that he had been exposed to the virus until he was diagnosed at age sixteen—approximately eleven years after Parkland first learned that the blood was contaminated with HIV.

---

1. All persons who are HIV positive do not have AIDS. The court takes judicial notice that former Los Angeles Lakers basketball superstar Earvin "Magic" Johnson was diagnosed with HIV in 1991; however, he does not have AIDS.

2. According to Plaintiff, the following screening information should have been obtained: whether the donor was homosexual, whether he engaged in unprotected sex, whether he had multiple sex partners, whether he closely associated with anyone who had AIDS, whether he lived with an AIDS patient, and whether he engaged in any other high risk activities.

When Kinzie initially confronted Parkland, it denied that he (Kinzie) had been transfused with HIV-positive blood. Kinzie's parents did not discover that he had been infected with HIV-positive blood until some time in late 1996.

Plaintiff brought this suit pursuant to 42 U.S.C. § 1983, alleging that Parkland violated his: 1) substantive due process rights under the Fourteenth Amendment; 2) procedural due process rights under the Fifth and Fourteenth Amendments; and 3) right under 21 C.F.R. § 610.47.[3] Parkland moves for dismissal under Fed. R.Civ.P. 12(b)(6). *See* Plaintiff's Complaint ¶¶ 4, 21, 24, 40–60.

## II. *12(b)(6) Standard of Review*

A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "is viewed with disfavor and is rarely granted." *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir.1997). A district court cannot dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir.1995). Stated another way, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). In reviewing a Rule

12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.; Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir.1999), *cert. denied*, 530 U.S. 1229, 120 S.Ct. 2659, 147 L.Ed.2d 274 (2000). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir.2000). Likewise, " '[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.' " *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993)). The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid cause of action when it is viewed in the light most favorable to the plaintiff and with every doubt resolved in favor of the plaintiff. *Lowrey*, 117 F.3d at 247. A plaintiff, however, must plead specific facts, not mere conclusory allegations, to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir.1992).

## III. *Analysis*

In light of the 12(b)(6) standard of review, to state a claim for relief against Parkland under § 1983, Kinzie must set forth allegations which, if proved, would establish that Parkland violated rights secured by the Constitution or laws of the United States, and that Parkland committed these alleged violations while acting under color of state law. *See American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S.

**3.** After Kinzie learned that he had been transfused with HIV-positive blood, and before he filed this cause of action, he filed a state law cause of action. The state suit was resolved by the parties. *See* Motion to Dismiss at 2. A copy of Plaintiff's state court petition and deposition excerpts relating to the state case have been included as part of the record in this case.

40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Piotrowski v. City of Houston,* 51 F.3d 512, 515 (5th Cir.1995) (*"Piotrowski I"*). Additionally, since Parkland is a governmental entity, for Kinzie to have stated a § 1983 claim, he must have sufficiently pleaded, that is, put Parkland on notice, that its official policy or custom deprived him of a federally protected right. *See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The court will in turn evaluate whether Plaintiff has met these requirements, and begins by evaluating whether Kinzie has pleaded that Parkland violated rights secured by the Constitution or laws of the United States.

### A. Plaintiff's Contentions Regarding Violations of Fourteenth Amendment Substantive Due Process Rights

To capture the essence of Plaintiff's substantive due process claims, the court references key passages from Plaintiff's Complaint:

41. In summary, Plaintiff was deprived of his substantive due process rights when Parkland
 a. recklessly failed to train its blood technicians despite a substantial certainty that blood recipients would be infected with HIV as a result;
 b. consciously disregarded the substantial risks to the lives and health of patients when it adopted a policy of not asking potential donors proper screening questions or doing any meaningful screening of donated blood for political reasons and in the face of a substantial certainty that patients would be infected as a result; and
 c. intentionally withheld that it had given James Kinzie HIV-infected blood for more than *eleven (11) years,* thus denying him treatment and counseling which could have improved his quality of life and denying him access to the courts.
42. Parkland's acts and omissions were so egregious as to shock the conscience and offend human dignity. As such, Parkland, a government entity acting under color of state law, violated Plaintiff's substantive due process rights guaranteed by the Fourteenth Amendment.

Plaintiff's Complaint ¶¶ 41, 42 at 12, 13 (emphasis in original).

Plaintiff expands on these summary allegations in his Complaint regarding substantive due process as follows:

43. Parkland has an affirmative duty to adequately train its employees in properly screening and obtaining blood from donors. Parkland breached this duty by recklessly failing to properly train its blood technicians to screen blood donors for HIV. The lack of training was so reckless or grossly negligent that deprivations of persons' constitutional rights were substantially certain to result. Because blood transfusion technicians were not properly trained, it was substantially certain that blood recipients would contract a deadly and incurable disease.
44. Parkland was subjectively aware of these risks and chose to establish a procedure of not properly training technicians to screen blood applicants. The reasons for such inadequate training were political and not guided by sound medical principles. The establishment of procedures that knowingly exposed patients to HIV infection due to political pressure from homosexual interest groups is

offensive to human dignity and shocks the conscience. As such, Parkland's behavior deprived James Kinzie of his constitutional substantive due process rights.

45. Furthermore, Parkland's failure to adequately train its employees in properly screening blood donors amounts to a "deliberate indifference" to the fundamental rights of persons who received potentially HIV contaminated blood, especially during the AIDS crisis as it existed in 1985.

46. Despite Parkland's heightened awareness of how HIV is transmitted, Parkland recklessly failed to train its blood technicians to ask specific questions recommended by the Center for Disease Control, which would flag potential high-risk HIV donors such a[s] Donor P3098.

47. The failure to adequately screen Donor P3098 was not an isolated event. Ms. Crayton was never trained to ask questions regarding a donor's sexual history during her entire period of employment with Parkland. Parkland did not permit its blood technicians to ask questions about whether a donor had multiple sex partners, engaged in unprotected sex, had homosexual sex, or participated in other high-risk activities. Parkland implemented a "don't ask, don't tell" policy with regard to sexual conduct. No medical reason existed for such a policy. These decisions were based on political pressure, not the best interests of patients. Such policies demonstrate a conscious disregard for the life of the patients. Such action by a state entity such as Parkland deprives citizens of their life and health in violation of citizens' substantive due process rights.

48. The Due Process Clause of the Fourteenth Amendment serves to protect citizens from acts of their state government that cause them personal harm. Supplying blood without any meaningful testing or screening of donors with knowledge that recipients of the blood will contract HIV as a result is such an act. Because of Parkland's policy regarding the training of blood technicians, Parkland officials knew that donors had likely not received or understood the Self–Deferral Sheet. And Parkland allowed blood donations even when the witness signature line on the Donor Card was blank, indicating that no Parkland personnel had ensured that the donor received and understood the Self–Deferral Sheet. Despite Parkland's subjective awareness that no adequate screens had been performed on the donors, Parkland accepted donors' blood and dispensed it to patients without any testing on the blood itself. Parkland did this despite the ready availability of tests for HIV antibodies.

49. In fact, the HIV status of donor P3098's blood was not tested until May of 1985—two (2) months after James Kinzie had received the blood. Coupled with inadequate donor screening, this action by Parkland in the face of a substantial risk of infection shocks the conscience and is offensive to human dignity. This policy deprived Plaintiff of basic fundamental interests in life and liberty guaranteed by the Fourteenth Amendment.

50. Parkland knew that it had supplied James Kinzie with HIV-infected blood in May of 1985, but Parkland personnel kept that fact a secret from James for eleven (11) years. And on information and belief, Parkland's failure to notify Plaintiff that he received HIV infected blood was not an isolat-

ed event. Instead, it was an established practice implemented by hospital personnel with final policymaking authority.

51. Furthermore, Parkland's Look–Back Committee intentionally withheld information regarding the positive HIV status of Donor P3098 from James Kinzie, James Kinzie's doctor, and Children's Medical Center. Parkland personnel made the decision not to inform James of his HIV status knowing that their decision would prevent James from seeking the medical treatment and counseling that he and his family needed. For the policymakers of a governmental unit to make such a callous decision for political reasons or to protect their own interests shocks the conscience and offends human dignity. These acts and omissions by Parkland thus violated James' substantive due process rights.

52. Parkland's decision to withhold James'[s] HIV status from him was a deliberate impediment to James'[s] access to the courts. The right of access guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution requires that an individual have adequate, effective, and meaningful access to court procedures. Acts of delay and suppression of evidence by a state actor constitute an impermissible burden on the right of access to the courts. Any deliberate impediment to access, even a delay in access, constitutes a constitutional deprivation addressable under § 1983.

Plaintiff's Complaint ¶¶ 43–52 at 13–16.

### B. Substantive Due Process

■ The Due Process Clause provides that "[n]o State ... shall deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. "Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (emphasis in original) (citations omitted). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). As a general rule, the state is under no obligation to provide protective services or aid to an individual. As the Supreme Court has made clear:

[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression."

*DeShaney by DeShaney v. Winnebago Dep't of Soc. Servs.,* 489 U.S. 189, 195–96, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (citations omitted).

■ This rule, however, is not absolute. Indeed, in *DeShaney* the Supreme Court made it unequivocally clear that "in certain limited circumstances the Constitution im-

poses upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. 998. The limited circumstances to which these affirmative duties apply are those "when the State takes a person into its custody and holds him there against his will." *Id.* at 199–200, 109 S.Ct. 998. This is so because:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 200, 109 S.Ct. 998 (citations omitted). The triggering mechanism that invokes the protection of the Due Process Clause is "the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty," *id.,* not the State's failure to act to protect the individual.

From what the court can determine based on a fair reading of Plaintiff's Complaint, Kinzie seeks to assert a substantive due process violation under three different theories: shocks the conscience, special relationship, and state-created danger. In any event, "[r]egardless of the theory of liability that a plaintiff is pursuing, in order to state a viable substantive due process claim the plaintiff must demonstrate that the state official acted with culpability beyond mere negligence." *McClendon v. City of Columbia,* 305 F.3d 314, 325 (5th Cir.2002) (*en banc*) (*McClendon II*). The "Due Process Clause is simply not impli-

cated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels,* 474 U.S. at 328, 106 S.Ct. 662 (emphasis in original). The court will discuss the validity of each theory as it determines the merits of the motion to dismiss.

Plaintiff appears to assert the "shocks the conscience" theory as the primary basis for his due process claims. *See* Complaint ¶¶ 24, 42, 48. Plaintiff's Complaint does not expressly aver the special relationship or state-created danger theories as bases for recovery, but he appears to assert some facts that arguably are consistent with each theory. Moreover, he expressly raised the theories in his Response to Defendant's Second Motion to Dismiss ("Plaintiff's Response"), filed April 25, 2000, *see* Plaintiff's Response at 13, 18, although at one point he appears to reject the special relationship theory.[4] Parkland also addressed the theories in its Reply to Plaintiff's Response ("Parkland's Reply"), filed May 5, 2000. *See* Parkland's Reply at 2, 5. Parkland's Reply set forth arguments that the special relationship and state-created danger theories are not applicable. Further, Parkland did not object or move to strike the theories as not being pleaded in Plaintiff's Complaint. Accordingly, in the interest of justice, the court considers these subsequent theories or allegations to be properly before it. *See Morin v. Moore,* 309 F.3d 316, 323 (5th Cir.2002). The court, in addition to analyzing Plaintiff's Complaint under the "shocks the conscience" theory of substantive due process liability, therefore, will also evaluate Plaintiff's Complaint under the special relationship and state-created danger theories. The court first addresses

---

4. In his surreply, Plaintiff states, *"Deshaney* and the issue of whether there is a *special relationship* are *totally irrelevant* in this case." Plaintiff's Surreply to Defendants' Reply to Plaintiff's Response to Defendants' Second Motion to Dismiss at 6 (emphasis in original).

the "shocks the conscience" theory of liability asserted by Plaintiff.

### 1. Substantive Due Process under the "Shocks the Conscience" Theory

■ A violation of substantive due process occurs if the state actor's conduct "can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis,* 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The "shocks the conscience" theory has several different characterizations or formulations. It has been described or characterized as conduct that "violates the decencies of civilized conduct"; conduct that is "so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency"; conduct that "interferes with rights implicit in the concept of ordered liberty"; and conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis,* 523 U.S. at 846–47, 118 S.Ct. 1708 (internal quotations and citations omitted). In a substantive due process claim under this theory, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n. 8, 118 S.Ct. 1708. The inquiry does not necessarily end here. "If this standard is met, a court must next determine whether there exist historical examples of recognition of the claimed liberty protection at some appropriate level of specificity." *Morris v. Dearborne,* 181 F.3d 657, 668 (5th Cir. 1999) (citing *Lewis,* 523 U.S. at 847 n. 8, 118 S.Ct. 1708). If the conduct does not reach the level of being so egregious or outrageous to shock the contemporary conscience, no substantive due process violation exists. *Id.*

Some would argue that the "shocks the conscience" theory is often not susceptible to easy application because it is imprecise and somewhat amorphous. The Supreme Court recognized this problem when it acknowledged that although "the measure of what is conscience shocking is no calibrated yard stick, it does ... point the way." *Lewis,* 523 U.S. at 847, 118 S.Ct. 1708. The Court did observe that the "shocks the conscience" concept "points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848, 118 S.Ct. 1708. Despite whatever criticisms one may lodge against the standard,[5] the Supreme Court made clear that only conduct which is truly "egregious" or "outrageous" would be considered conscience-shocking. *Id.* at 847 n. 8, 118 S.Ct. 1708. The question that this court must therefore decide is whether the allegations of Plaintiff's Complaint describing the conduct state facts which rise to the level of being outrageous or egregious in a constitutional sense and therefore, if proved, state a claim upon which Plaintiff could recover.

■ First, the court determines that the gravamen of Plaintiff's Complaint is that Parkland failed to test blood that was provided through a blood bank that it operated and failed to train its employees to obtain certain screening information as it related to blood donors. Plaintiff's Complaint has all the correct buzzwords and legal jargon in describing the conduct of Parkland and its employees. For example, the Complaint is liberally sprinkled with words such as "consciously disregarded,"

5. *See Rochin v. California,* 342 U.S. 165, 175, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (Black, J., concurring); *Lewis,* 523 U.S. at 860, 118 S.Ct. 1708 (Scalia, J., concurring in judgment).

"recklessly," "grossly negligent," "deliberate indifference," "conscious disregard," "intentionally," "callous," and "deliberate." A liberal reading of Plaintiff's allegations, when stripped of these descriptive words, at most, reveals negligent conduct with respect to the conduct of Parkland and its employees, that is, Parkland's failure to test donated blood for HIV. Thus, what caused Kinzie to become infected with HIV was the failure to test the tainted blood for the virus. In other words, according to Kinzie, had the blood from the donor been tested, he in all probability would never have contracted HIV.

The court agrees; however, the addition of the modifiers and use of legal legerdemain do not transform the underlying conduct from simple negligence into a constitutional tort.

Kinzie's heart surgery at Children's Medical Center took place on March 11, 1985. Kinzie received several units of blood during his surgery and recovery. One of the units of blood was later found to be HIV-positive. The unit donated by the homosexual male was not tested, and was given to Kinzie during his surgery or recovery. A test for the detection of HIV had been approved on March 4, 1985, and was available to Parkland. Parkland therefore could have hád the blood tested to detect the presence of HIV before it was transfused to Kinzie. Kinzie contends that an AIDS virus test would have virtually eliminated his risk of transfusion-associated HIV. The court disagrees.

The virus was only discovered a few years earlier and not much was known about it. *Moreover, given the short period of time between the date the test was approved and the date it became available for the detection or screening of HIV and the transfusion of the blood, at most one could say that the conduct of Parkland and its employees was negligent.* Without

cavil, testing now is done by hospitals, blood banks, transfusion services, and medical facilities, or is done by some entity on behalf of these organizations. Indeed, it is unfathomable in 2002 that appropriate testing would not be done to ensure that blood and blood products given to patients are not infected with HIV and other infectious diseases. In light of what is known currently about HIV and the availability of and the need to test blood and blood products, such failure and lack of training presently could meet the "shocks the conscience" test. Given the recent availability of the test for the detection of HIV and the lack of universal or uniform testing in the medical field at the time of Kinzie's surgery in 1985, *however*, the court cannot say that the conduct of Parkland and its employees was anything more than simple negligence.

Today it goes without saying that much more is expected and demanded of the medical profession to ensure that blood and blood products are tested to minimize the risks of a patient receiving HIV-positive blood or blood products. Without a doubt, much more is known about HIV and AIDS than was known in 1985. This whole area was new to the medical and scientific communities until the early 1980's. The term "acquired immunodeficiency syndrome" and the acronym AIDS came into existence sometime in 1982. *See* Merriam Webster's Collegiate Dictionary at 10, 24. Moreover, some of the documents submitted by Kinzie clearly indicate that much was unknown about HIV in 1985, and the immediately preceding years. The court realizes that negligence is a fluid standard; however, in light of the previously stated facts, the court determines that the omissions and failures of Parkland and its employees in 1985 did not transcend simple negligence.

Perhaps even more telling is the allegation contained in Plaintiff's Fifth Amended Petition filed in state court prior to the filing of this action where he states "[t]his action arises out of the negligent blood banking activities of Defendant Parkland and others, as well as negligent hospital administration by Defendant Children's [Medical Center of Dallas]." *Id.* ¶ 3 at 3. Plaintiff necessarily concedes that this is a negligence action; however, he takes the same set of facts and seeks to elevate them to the level of constitutional deprivations. *Compare* Plaintiff's Fifth Amended Petition *with* Plaintiff's Third Amended Complaint. The negligent conduct of Parkland and its employees simply cannot satisfy the "shocks the conscience" standard, because "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis,* 523 U.S. at 849, 118 S.Ct. 1708.

Second, the court's research reveals that courts have shown great reluctance to find that the behavior of a state official "shocks the conscience," and those that have done so based their determinations on conduct that is far worse than Parkland's failure to test its donated blood and train its employees.[6] The court found only one case in which the Supreme Court has found the behavior of state actors to be conscience-shocking and violative of due process. *See Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (forced stomach pumping of a criminal suspect to retrieve drug capsules that he swallowed).

Circuit courts have also been reluctant to find that conduct "shocks the conscience." Circuit cases in which a plaintiff has established that the state actor's conduct shocked the conscience, or those where a court has stated that a reasonable

fact finder could find the conduct to be conscience-shocking, all required that the conduct evince an intent to cause harm, or show a deliberate act to bring about the specific injury to the plaintiff. *See,* e.g., *Neal v. Fulton County Bd. of Educ.,* 229 F.3d 1069, 1075–76 (11th Cir.2000) (student blinded in one of his eyes when a coach intentionally hit him in the head with a metal weight); *Morris v. Dearborne,* 181 F.3d 657, 668 (5th Cir.1999) (teacher's fabrication of sex abuse charges against a student's father); *Rogers v. City of Little Rock,* 152 F.3d 790, 797 (8th Cir.1998) (rape of a woman at her house by a police officer after he stopped her for a traffic violation); *Hemphill v. Schott,* 141 F.3d 412, 419 (2d Cir.1998) (assistance provided by police officer to a third party in shooting the plaintiff); *Harrington v. Almy,* 977 F.2d 37, 43–44 (1st Cir.1992) (police office ordered to submit to a psychological examination, which included a penile plethysmograph, or be terminated); *Checki v. Webb,* 785 F.2d 534, 538 (5th Cir.1986) (state trooper intentionally used his vehicle to terrorize motorist and passenger); *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981) (police officer intentionally struck tourist because he was photographing the police officer and fellow officers apprehending a boy on the street during Mardi Gras parade). That these cases involve conduct far worse than the omission and failure of Parkland and it employees to test donated blood necessarily strengthens the court's determination that Plaintiff's Complaint fails to state any claim of constitutional magnitude. Other than a general assertion of intent or deliberate indifference, Plaintiff has not alleged that Parkland or its employees intended to bring about the specific injury to him or

---

6. *The court has diligently attempted to find a case even remotely similar to the present case. Research has revealed no case marginally on point, and the parties have submitted no cases similar to this case.*

that they acted deliberately to bring about the specific injury to him.

Third, the court believes that Plaintiff's ability to state a claim for a substantive due process violation is foreclosed by *Collins v. Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). In *Collins*, a widow brought suit pursuant to 42 U.S.C. § 1983 after her husband died of asphyxia after he entered a manhole to unclog a sewer line. Collins's widow contended that her husband "had a constitutional right to be free from unreasonable risks of harm to his body, mind, and emotions and a constitutional right to be protected from the [City's] custom and policy of deliberate indifference toward the safety of its employees." *Id.* at 117, 112 S.Ct. 1061. She also contended that the City violated this right by "following a custom and policy of not training its employees about the dangers of working in sewer lines and manholes." *Id.* She further contended that this policy and custom extended to "not providing safety equipment at jobsites, and not providing safety warnings." *Id.* Finally, Collins's widow contended that, because of a previous incident, in which Collins's supervisor was found unconscious in a manhole a few months before Collins's death, the City was on notice of the risks presented to its sanitation workers, but "systematically and intentionally failed to provide the equipment and training required by a Texas statute." *Id.* at 117–18, 112 S.Ct. 1061.

In *Collins*, the Court held that the City's alleged failure to train its sanitation employees or warn them about the known risks of danger was not "an omission that can properly be characterized as arbitrary, or conscience-shocking in a constitutional sense." *Id.* The Court stated that the claim of Collins's widow was "analogous to a fairly typical state-law tort claim," and that it has consistently rejected attempts

to interpret the Due Process Clause "to impose federal duties that are analogous to those traditionally imposed by state tort law." *Id.* at 128, 112 S.Ct. 1061. In refusing to elevate the widow's claim to one of constitutional dimension, the Court stated:

> Our refusal to characterize the city's alleged omission in this case as arbitrary in a constitutional sense rests on the presumption that the administration of government programs is based on a rational decision-making process that takes account of competing social, political, and economic forces. Decisions concerning the allocation of resources to individual programs, such as sewer maintenance, and to particular aspects of those programs, such as the training and compensation of employees, involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.

*Id.* at 128–29, 112 S.Ct. 1061 (internal citation omitted).

The allegations of Plaintiff's Complaint in this case regarding failure to train, negligence and notice are essentially identical to those made in *Collins*, and the same substantive due process deprivation is asserted. The court thus finds *Collins* to be illustrative and controlling. Here, as in *Collins*, Plaintiff does not allege that Parkland or any of its employees deliberately harmed him personally, or deliberately sought to bring about the specific injury insofar as the failure to test and screen blood donors. *See Collins*, 503 U.S. at 125, 112 S.Ct. 1061. For the reasons stated herein, Plaintiff's Complaint does not state a constitutional violation against Parkland.

■ Kinzie cites the conduct of Parkland and its employees or agents as conscience-shocking with respect to Parkland's failure to notify him and his parents

that he had been infected with HIV-positive blood. The court agrees that this failure "shocks the contemporary conscience." Parkland's action in this regard is inexplicable, inexcusable, and unconscionable. Parkland's conduct, after finding out that Kinzie had been transfused with HIV-positive blood, was simply outrageous. This failure and withholding of information denied Kinzie the availability of certain medical treatment that could have been used to combat his condition or ameliorate certain symptoms. As outrageous as Parkland's conduct was, however, it is not what caused Kinzie's injury. Kinzie's injury, as stated before, came about at most because of negligent conduct, not because of what transpired after he had already been transfused with the HIV-positive blood. Accordingly, regardless of how Parkland's post-transfusion conduct is characterized, it did not cause Kinzie's injury and cannot serve as the basis for a constitutional claim. Contrary to Plaintiff's assertions, as will be discussed later, the failure to notify and the withholding of information regarding Kinzie's HIV status do not state a claim for denial of medical care or denial of access to the courts.

### 2. Substantive Due Process under the Special Relationship Theory

■ Plaintiff attempts to use the special relationship theory to hold Parkland responsible for allowing him to be transfused with HIV-positive blood, and for not informing him that he had received HIV-positive blood. Plaintiff's Response at 13–14. As previously stated, a section 1983 plaintiff can rely on his "special relationship" with a state actor to allege or establish a substantive due process violation if the state actor did not protect him from harm. *See Walton v. Alexander*, 44 F.3d 1297, 1299 (5th Cir.1995) (*en banc*); *Piotrowski v. City of Houston*, 237 F.3d 567, 584 (5th Cir.2001) (*Piotrowski II*). Plain-

tiff's substantive due process claim, however, is not susceptible to the theory because a special relationship "only arises when a person is involuntarily confined or otherwise restrained against his will pursuant to a governmental order or by affirmative exercise of state power." *Walton*, 44 F.3d at 1299; *see also Piotrowski II*, 237 F.2d at 584 n. 31. Plaintiff has not pleaded that he was involuntarily confined by Parkland or otherwise restrained against his will, and it is not conceivable that he can do so. He therefore cannot rely on the special relationship theory as a basis for substantive due process liability. As a result, 12(b)(6) dismissal is appropriate with respect to Plaintiff's substantive due process claim, to the extent he asserts a special relationship as the basis to hold Parkland responsible for not protecting him from harm.

Kinzie contends that a special relationship can exist in a noncustodial setting. This assertion is an incorrect statement of the law based on existing precedent in this circuit. The *en banc* decision of the Fifth Circuit in *Walton* made it unequivocally clear that custody, or involuntary confinement or restraint was a necessary element to establish a special relationship when it concluded, "[W]e hold that a 'special relationship' arises between a person and the state *only* when this person is involuntarily confined against his will through the affirmative exercise of state power." *Walton*, 44 F.3d at 1306 (emphasis added). Regardless of how draconian or restrictive Kinzie may think the law to be, as he was not in custody or otherwise involuntarily restrained by Parkland, he cannot assert this theory as a basis for liability. He cannot state a claim upon which relief can be granted based on a special relationship between him and Parkland, and Parkland is therefore entitled to dismissal of this claim under Fed.R.Civ.P. 12(b)(6).

### 3. Substantive Due Process under the State–Created Danger Theory

Plaintiff contends that "his constitutional rights were deprived through a state[ ]created danger." Plaintiff's Response at 18. In particular, Kinzie contends that Parkland's "don't ask, don't tell" policy created a dangerous environment, because Parkland employees were inadequately trained to screen potential blood donors, who were infected with or exposed to the AIDS virus; that Parkland's training policies were known to be dangerous, because homosexual males were known to be a high risk group associated with carrying HIV; that the inadequate training policies allowed blood to be donated from individuals who were part of this high risk group for carrying HIV; and that Parkland created an opportunity for him to be injured that would not have otherwise existed, because Parkland's training policies allowed employees to disregard parts of the screening process, which would have prevented high risk donors from donating blood. *Id.* at 18–20.

This court is uncertain of the viability of the state-created danger theory in this circuit. At one point, the Fifth Circuit "explicitly adopted and enforced [the state-created danger] theory." *McClendon v. City of Columbia,* 258 F.3d 432, 436 (5th Cir.2001) (*McClendon I* ). In a later *en banc* decision, the Fifth Circuit neither adopted nor rejected the state-created danger theory. *See McClendon v. City of Columbia,* 305 F.3d 314 (5th Cir.2002) (*McClendon II* ); *Morin v. Moore,* 309 F.3d 316, 321 (5th Cir.2002). Assuming that the Fifth Circuit were to hold that the state-created danger theory is constitutionally sound, the court determines that Kinzie has failed to state a claim upon which relief can be granted under such a theory.

■■■ To state a substantive due process claim under the state-created danger theory, a plaintiff must plead facts, which show "that the state actors increased the danger to [him, and] that the state actors acted with *deliberate indifference.*" *See McClendon I,* 258 F.3d at 435 (quoting *Piotrowski I,* 51 F.3d at 515) (emphasis added). State actors act with deliberate indifference when the "environment created by the state actors [is] dangerous; they ... know it is dangerous; and, ... they ... have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur." *Id.* at 436 (quoting *Johnson v. Dallas Indep. Sch. Dist.,* 38 F.3d 198, 200 (5th Cir.1994)). In further explaining the deliberate indifference standard, the court stated:

> To act with deliberate indifference, a state actor must know [ ] of and disregard [ ] an excessive risk to [the victim's] health or safety. . The state actor's actual knowledge is critical to the inquiry. A state actor's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, does not rise to the level of deliberate indifference.

*McClendon II,* 305 F.3d at 326 n. 8. (internal quotations and citations omitted). The "key element in the state-created danger theory is a determination that the state actor created the danger to the plaintiff *or at least made him more vulnerable to it.*" *Id.* at 437 (emphasis added).

■■■ The Fifth Circuit has applied the state-created danger theory only in a factual context where a state actor allegedly failed to protect a plaintiff from harm caused by the *intentional criminal actions* of a third party. *See McClendon I,* 258 F.3d 432. The circuit also requires that the theory, if it is viable constitutionally, be applied only when the state is aware of

a harm or danger to a *known* victim. *See Morin,* 309 F.3d at 322–23; *Saenz v. Heldenfels Bros., Inc.,* 183 F.3d 389, 392 (5th Cir.1999). Plaintiff's Complaint does not contain averments that he was harmed by a third party's intentional criminal actions, or that he was a known victim.

Regarding a third party's intentional criminal actions, Plaintiff has not alleged that Parkland failed to protect him from such actions of a third party, and it is not conceivable that he can bring forth facts to this end. Nothing about Plaintiff's allegations suggests that the donor of the HIV-positive blood intended to harm him. Even assuming the donor knew he was HIV-positive, he would only have known that his donated blood might be randomly transfused to an unidentified recipient. There is no conceivable reason to conclude that the donor specifically knew Plaintiff would receive the HIV-positive blood. Consequently, if the court applied the state-created danger theory to the present facts, it would transgress the precedent by the Fifth Circuit's application of the theory. Since courts are admonished to exercise restraint when engaging in any expansion of substantive due process protections, *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), the court declines to extend the application of the state-created danger theory beyond the factual constraints in which the Fifth Circuit has recognized it as a possible basis for recovery.

Regarding a known victim, Plaintiff has not pleaded, and cannot conceivably plead that when Parkland accepted the donor's HIV-positive blood, it knew he specifically was in danger of receiving the blood. The blood apparently went into Parkland's general blood supply. There is nothing in the record to indicate the allocation of the infected blood to Kinzie was anything other than random. As such, Parkland could not have known that Plaintiff specifically would be a victim. At most, Parkland knew that the general class of persons who received blood transfusions might be in danger of receiving HIV-positive blood, but this general knowledge does not comport with the Fifth Circuit's requirement that there be a *known* victim. The Fifth Circuit instead requires that the state be able to identify a specific individual that will be the target of harm. *See Morin,* 309 F.3d at 322–23; *Saenz,* 183 F.3d at 392. As such, the state-created danger theory, even if viable in this circuit, cannot be satisfied, and Plaintiff therefore has not stated a substantive due process claim based on the theory.

In addition to his failure to plead facts showing that he was a known victim, Kinzie wholly fails to allege underlying facts from which one could find that Parkland and its employees acted with deliberate indifference. As stated before, at most Kinzie has alleged a case of simple negligence under state law. Other than the general characterizations and conclusory allegations in his Complaint, Kinzie alleges no underlying facts to show that deliberate indifference is present. Kinzie only alleged that Parkland and its employees knew that homosexual males, as well as certain other categories of individuals, were in a high risk group for carrying HIV.

The court agrees that Parkland and its employees knew that homosexual males were in a high risk group for carrying HIV. This knowledge alone, however, is insufficient to state facts which would show deliberate indifference. Moreover, there are no allegations that Parkland and its employees knew an inordinate or high percentage of its donors were homosexual males or members of some other high risk group, or that Parkland knew that a significant quantity of blood collected by its

blood banks was done so in areas where there were large concentrations of homosexual males or members of other HIV high risk groups. No facts have been pleaded that would show that Parkland or its employees knew of an "excessive risk" to Kinzie's health or safety. The underlying facts do not show that Parkland and its employees knew of a "significant risk" to Kinzie himself.

Even if Parkland and its employees should have known of such a risk, failure to perceive it does not constitute deliberate indifference. *See McClendon II*, 305 F.3d at 326 n. 8. While Parkland was certainly aware of HIV in 1985, it apparently did not appreciate fully the consequences of its failure to test donated blood, and, in retrospect, its action in not testing blood and adequately screening donors could be regarded as foolish. Foolish conduct, however, is not synonymous with that which is deliberately indifferent.

For the reasons stated previously, Kinzie fails to state a claim upon which relief can be granted regarding his state-created danger theory. Parkland is entitled to dismissal of this claim under Fed.R.Civ.P. 12(b)(6).

## C. Substantive Due Process and Violation of the Right to Medical Care

 Plaintiff contends that "Parkland's custom of failing to inform recipients of HIV-contaminated blood denied Plaintiff his constitutional right to medical care." Complaint ¶ 53. Plaintiff has not provided the court with any authority which demonstrates that persons in his situation have a right to medical care under substantive due process. True, the right to medical care has been recognized, but only in situations where the state has taken affirmative steps to restrain a person's liberty, as in the case of pretrial detainees, persons in police custody, or prisoners. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir.1996) (*en banc*); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, *medical care*, and reasonable safety—it transgresses the substantive limits on state action set by the … Due Process Clause.") (emphasis added). Plaintiff was *not a pretrial detainee, person in police custody, person institutionalized against his will or otherwise restrained, or prisoner*, and no such allegation has been made. Indeed, Plaintiff was *not under the care, custody or control of Parkland*, or otherwise restrained by Parkland, as his surgery and hospital stay occurred at Children's Medical Center, a facility not owned, operated, or under the control of Parkland.

Kinzie has not pleaded, and the court has no basis to determine, that he can set forth any facts that he has a constitutional right to medical care. Plaintiff's claim that Parkland violated his substantive due process rights by interfering with his right to medical care is therefore appropriate for dismissal pursuant to Fed.R.Civ.P. 12(b)(6). The court in no way condones the inexplicable conduct of Parkland by its extended failure to notify Kinzie or his parents that he had received HIV-positive blood. The court, however, is duty bound to follow existing precedent.

## D. Substantive Due Process and De-

### nial of Access to the Courts[7]

■ Plaintiff contends that "Parkland's decision to withhold [his] HIV status ... was a deliberate impediment to [his] access to the courts." Complaint ¶ 52. The court finds the recently decided case of *Christopher v. Harbury*, 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), to be dispositive of Kinzie's denial of access to the courts claim. In *Harbury*, the widow of a murdered Guatemalan citizen brought a *Bivens* action, contending, among other things, that certain federal officials concealed and covered-up information regarding her husband's fate, and ultimate death, and that such concealment denied her the right of access to the courts. *Id.*

■ In *Harbury*, the Supreme Court observed that access-to-courts claims fall into two categories: claims that "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," where the suits could be pursued "once the frustrating condition has been removed," *id.* at 2185–86, and claims of "specific cases that cannot not be tried (or tried with all material evidence), no matter what official action may be in the future." *Id.* at 2186. Regardless whether the claim "turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* A claim for deprivation of one's consti-

tutional right of access to the courts must set forth in the complaint (1) "the underlying cause of action, whether anticipated or lost," and (2) "the official acts frustrating the litigation." *Id.* at 2187. Here, because of the court's dismissal of Plaintiff's due process claims pursuant to Fed. R.Civ.P. 12(b)(6), there is no predicate or underlying claim. Accordingly, Plaintiff's denial of access to the courts claim necessarily fails. Moreover, as Plaintiff has filed two lawsuits, he has not established how he has been harmed or prejudiced by Parkland's actions insofar as the existence of a viable constitutional claim. Parkland is therefore entitled to dismissal of this claim under Fed.R.Civ.P. 12(b)(6).

### E. Violation of 21 C.F.R. § 610.47

■ Plaintiff contends that "[t]he Supreme Court construes § 1983 as providing a remedy for violations of rights secured by federal regulations." Plaintiff's Response at 3. He therefore asserts 21 C.F.R. § 610.47 as a regulation that is actionable under section 1983. *See id.* Parkland disagrees and also contends that the regulation does not apply to Kinzie, because it was not in effect when he learned of his HIV-positive status.

Section 610.47 sets forth the following:

(a) Transfusion services that are not subject to the Health Care Financing Administration's regulations on conditions of Medicare participation for hospitals ... are required to take appropriate action ... when a recipient has received Whole Blood or blood components from a donor determined to be unsuitable

---

7. Plaintiff characterizes his right of access to the courts as a substantive due process right under the Fifth and Fourteenth Amendments. Complaint at 15. The court also recognizes that the right has been characterized as deriving from "the privileges and immunities clause of article IV, section 2 of the Constitu-

tion ... and the right of petition found in the first amendment." *See Crowder v. Sinyard*, 884 F.2d 804, 811 n. 7 (5th Cir.1989), *abrogated on unrelated grounds*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Regardless of how the right is characterized, the court reaches the same result.

when tested for human immunodeficiency virus (HIV) infection . . . .

(b) . . . . If the transfusion service has administered Whole Blood or blood components as described in paragraph (a) of this section, the transfusion service shall notify the recipient's attending physician . . . and ask him or her to inform the recipient of the need for HIV testing and counseling. If the physician is unavailable or declines to notify the recipient, the transfusion service shall notify the recipient and inform the recipient of the need for HIV testing and counseling. The notification process shall include a minimum of three attempts to notify the recipient . . . . The transfusion service *is* responsible for notification, including basic explanations to the recipient and referral for counseling, and shall document the notification or attempts to notify the attending physician or the recipient . . . .

21 C.F.R. § 610.47(a)-(b).

Parkland contends that § 610.47 did not become effective until February 7, 1997. Kinzie does not dispute or address this contention. The research by the court could not verify that this regulation did not become effective until February 7, 1997. The court, however, finds it unnecessary to address this argument.

Assuming that the regulation was in effect during the relevant time period, the court must decide whether Plaintiff has pleaded a violation of rights secured by the Constitution and *laws* of the United States. 21 C.F.R. § 610.47 is not a right secured by the Constitution. It is a federal regulation. Accordingly, it is necessary for the court to determine whether a regulation is a "law" within the meaning of section 1983.

The Fifth Circuit has stated that "it is not clear that regulations can be considered 'laws' for purposes of creating a right actionable under section 1983." *Gracia v.* *Brownsville Housing,* 105 F.3d 1053, 1057 (5th Cir.1997). A federal regulation cannot provide the basis for a cause of action "where the statute in question does not create enforceable rights, privileges, or immunities within the meaning of section 1983." *Id.* (internal quotations and citations omitted). "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (citation omitted). The job of the court is to "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Plaintiff contends that the regulation in question was promulgated by the Department of Health and Human Services pursuant to authority under 42 U.S.C. §§ 1300 and 1395hh. Neither of these statutes nor any other statutes cited by Plaintiff or Defendant authorize, or show an intent by Congress to create, a private cause of action for patients to enforce the statutes in question, or for an agency to promulgate regulation such as § 610.47 to allow patients to file a lawsuit. Plaintiff acknowledges that "the legislative history of the regulation [§ 610.47], provided in Appendix B, suggests that no enforcement mechanism was even contemplated by Congress, the Department of Health and Human Services, or the Food and Drug Administration, other than informally informing or filing a complaint with non-governmental hospital accreditation organizations." Plaintiff's Supplemental Response at 8. This statement only reinforces the court's conclusion that Congress did not intend to create any private right of action. For the reason's stated herein, the court determines that § 610.47 does not create a private cause of action for Plaintiff to vindicate through 42 U.S.C. § 1983.

Accordingly, the claim brought pursuant to this regulation must be dismissed.

### F. Violation of Procedural Due Process Rights

■ Procedural due process has evolved such that the "essence of due process is that 'deprivation of life, liberty, or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *In re Nissan Motor Corp. Antitrust Litigation,* 552 F.2d 1088, 1103 (5th Cir.1977) (quoting *Mullane v. Ctr. Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)) (emphasis added). The only allegation in Plaintiff's Complaint regarding procedural due process is the blanket statement that Plaintiff was deprived of his "procedural due process rights under the Fifth and Fourteenth Amendments." Complaint ¶ 40. Beyond this wholly conclusory statement, Plaintiff neither alleged that he was entitled to procedural due process, nor explained how his procedural due process rights were violated. Accordingly, this claim is not "well-pleaded," and the court has no basis to find that there may be conceivable facts that support the claim. Dismissal under 12(b)(6) therefore is appropriate with respect to Plaintiff's claim that Parkland violated his procedural due process rights under the Fifth and Fourteenth Amendments.

Moreover, even if Plaintiff has adequately pleaded a procedural due process claim, it fails as a matter of law. A court does not proceed to determine whether a procedural due process violation has occurred unless it has first determined that a substantive deprivation has occurred. *American Mfrs. Mutual Ins. Co. v. Sullivan,* 526 U.S. at 60, 119 S.Ct. 977; *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Since the court has determined that Plaintiff has not stated a constitutional violation for substantive due process, a procedural violation cannot exist as a matter of law. Accordingly, for the reasons stated, Plaintiff's procedural due process claim fails, and Parkland is entitled to dismissal of this claim.

### G. Government Policy or Custom Requirement

To determine the issue of liability against a governmental entity requires the separation of two issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [governmental entity] is responsible for that violation." *Collins,* 503 U.S. at 120, 112 S.Ct. 1061. Parkland, as a governmental entity, "can be sued and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right." *Board of the County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The governmental entity's conduct must be the "moving force" behind the injury alleged by a plaintiff. *Brown,* 520 U.S. at 404, 117 S.Ct. 1382. A governmental entity cannot be liable for civil rights violations under a theory of respondeat superior or vicarious liability. *Id. See also Baskin v. Parker,* 602 F.2d 1205, 1208 (5th Cir.1979).

As the court has concluded that Plaintiff has alleged no constitutional violations, the issue of a municipal policy or custom becomes irrelevant and "quite beside the point," because such policy or custom cannot be the basis of a constitutional claim if no constitutional violation exists in the first place. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89

L.Ed.2d 806 (1986). Accordingly, Kinzie's claims against Parkland fails as a matter of law, and the court need not address the second issue of liability.

### IV. *Conclusion*

This case has been perhaps the most difficult case the court has had to resolve. The circumstances and facts giving rise to this action are sad and regrettable, with tragic and deadly consequences. Kinzie will require ongoing treatment for his condition, because, as stated earlier, there is no known cure for AIDS, and Kinzie's HIV status is permanent; it will be with him the rest of his life. Undoubtedly, there will be numerous visits to the doctor and some hospital stays. He will of course require continued treatment with antiretroviral therapy and drugs, which are quite costly. As with any drug, there are side effects, and side effects for HIV patients can be quite significant. Aside from the medical and health concerns, Kinzie must deal with the social stigma of being HIV-positive, even though he was a hapless victim. Kinzie will likely be treated as a outcast by many, because some people still primarily associate HIV with homosexuality, which is not embraced or endorsed by society as a whole. Finally, Kinzie's condition greatly complicates the prospect of any intimate relationship and the prospect of marriage because of a person's fear of contracting HIV or AIDS.

That the conduct has deadly and tragic consequences, however, does not elevate it to the level of conduct which is deliberately indifferent or constitutionally impermissible. A negligent act can, and often does, have the same consequences as one done with deliberate indifference. Most of the 40,000 or so persons who are killed annually in automobile accidents in the United States die as a result of a negligent act. By way of example, suppose a driver runs a traffic light when he is momentarily distracted while dialing a number on his cell phone and collides with another vehicle with four occupants, killing two and causing the other two to be quadriplegics for the remainder of their lives. Certainly any reasonable person would agree that the conduct of the driver resulted in sad and extremely tragic consequences, and, by the same token, no reasonable person would contend that the driver acted with deliberate indifference. Indeed, on the facts of this example, it would be fatuous to make such an assertion.

Now on the other hand, if the driver saw that the traffic light controlling his movement had just changed from yellow to red, saw the other vehicle proceeding or about to proceed through the intersection, ignored the other vehicle and that it had the right of way, was aware of the risk of injury to the occupants of the other vehicle by proceeding through the light with his vehicle, and made a deliberate choice to proceed through the light and thereby collided with the other vehicle, his conduct certainly could constitute deliberate indifference, because he fully appreciated the danger and risk to his victims yet made a deliberate or conscious decision to disregard the known risk and safety of the individuals in the other automobile.

We simply do not have this level of conduct in this case, and Kinzie has not pleaded any allegations to establish that Parkland or its employees acted in this manner. Kinzie's allegations are general and seek to emphasize the consequences rather than the conduct necessary to state a claim. The focus, however, must be on the level of conduct, not the consequences of the conduct. If it were otherwise, every wrong or infraction committed by a state actor could be transformed into a constitutional tort. The Supreme Court has cau-

tioned that the Due Process Clause may not be used in this manner.

For the reasons stated herein, Plaintiff has failed to state a claim upon which relief can be granted. The court therefore **grants** Defendant's Second Motion to Dismiss, and **dismisses** this action with prejudice. Judgment will issue by separate document as required by Fed.R.Civ.P. 58.